IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 23-40316-11 |
| DFW BOAT SPECIALISTS, LLC, | § | |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

### AFFIDAVIT OF EDWARD TREMBLAY

1.      My name is Edward Tremblay.  I am the Vice President Collections for XL Funding,

LLC d/b/a AXLE Funding f/k/a Auction Credit Enterprises, LLC ("XL Funding"). I am over the

age of eighteen (18) and duly qualified to make this affidavit. I have personal knowledge of the

facts stated herein based on the performance of my duties as Vice President Collections for XL

Funding, and the statements made herein are true and correct.

2.      I am one of the custodians of records for XL Funding as those records pertain to

DFW Boat Specialists, LLC (the "Debtor"). I have personally worked on said records and can

confirm that the following facts are true based on my own personal knowledge or my knowledge

gained as a custodian of XL Funding's business records, which are kept by XL Funding in the

regular course of its business. Moreover, it was the regular course of business of XL Funding for

an employee or a representative of, with knowledge of the acts, conditions, or opinions recorded,

to make those records or to transmit the information to be included in such records; and such

records were made at or near the time or reasonably soon after the acts, conditions or opinions

recorded. The documents attached hereto as Exhibits "A" through "C" constitute XL Funding's

business records.

3.      XL Funding is in the business of providing secured financing to car dealers through

which those car dealers may finance some or all of their inventory held for resale to retail

consumers ("floor plan financing").  On or about November 2, 2022, XL Funding and Debtor entered

into a Demand Promissory Note and Security Agreement (the "Note").  A true and correct copy of

said Note, including any applicable amendments, is attached hereto and incorporated by reference for

all purposes as Exhibit "A."

4.      Pursuant to paragraph 3 of the Note, Debtor granted to XL Funding a perfected,

first-priority blanket security interest in all personal property assets of the Debtor, including but

not limited to the Debtor's motor vehicle inventory ("Inventory Collateral").  The Inventory

Collateral includes but is not limited to the following nine (9) unpaid motor vehicle inventory

financed by XL Funding under the Note by stock number, year, make, model, and VIN:

| Dealer # | Vehicle Description | VIN | Balance Due Under Note |
|---|---|---|---|
| 14905.31 | 2012 Nissan Armada | 5N1BA0NDXCN622240 | $5,753.00 |
| 14905.34 | 2014 Chevrolet Cruze | 1G1PG5SB3E7232850 | $2,394.00 |
| 14905.35 | 2013 Chevrolet Silverado | 1GCRKSE74DZ337470 | $7,813.00 |
| 14905.32 | 2012 Ford Edge | 2FMDK4JC5CBA57563 | $5,855.00 |
| 14905.33 | 2015 Jeep Patriot | 1C4NJPFA4FD209271 | $4,738.00 |
| 14905.24 | 2011 Chevrolet Cruze | 1G1PC5SH9B7177252 | $2,557.00 |
| 14905.25 | 2009 Chevrolet Avalanche | 3GNFK12089G232465 | $4,941.00 |
| 14905.26 | 2011 Ford Explorer | 1FMHK8D85BGA73544 | $5,950.00 |
| 14905.23 | 2010 Chevrolet Equinox | 2CNFLPEY9A6305185 | $3,527.00 |

(collectively, the "XL Funding Inventory").

5.      XL Funding's first priority lien and security interest in the XL Funding Inventory

and blanket security interest in all of Debtor's remaining assets, including but not limited to the

other motor vehicle inventory on Debtor's lot not specifically financed by XL Funding, accounts,

receivables, chattel paper, and other forms of cash collateral, is evidenced by the following

documents:

a.      The Note along with all attachments and exhibits thereto.  Specifically, paragraph 3 of the Note grants XL Funding a first priority purchase money security interest in the XL Funding Inventory and a blanket security interest in all remaining assets of Debtor, including cash collateral.

b.      A UCC-1 Financing Statement filed with the Texas Secretary of State on February 25, 2022, which was assigned file number 22-0009750631.  A true and correct copy of the UCC-1 Financing Statement along with all amendments thereto, if any, is attached hereto as **Exhibit B**.

c.      A Receivable Detail Report dated February (the "RDR"), which identifies the vehicles currently floor planned by the Debtor with XL Funding that remain unpaid.  A true and correct copy of the RDR is attached hereto as **Exhibit C**.

6.      The RDR lists each of the XL Funding Inventory vehicles which the Debtor and XL Funding (collectively, the "Parties") agreed to place on the Debtor's floorplan and for which the original title was tendered by Debtor to XL Funding as security.

7.      The indebtedness under the Note has not been repaid and XL Funding retains its lien on the XL Funding Inventory, including any sales proceeds generated from the sale of any XL Funding Inventory vehicle to a third party consumer.

8.      As shown by the RDR, the amount due and owing under the Note totals $43,538.00 for all unpaid XL Funding Inventory vehicles, after the consideration of all lawful offsets, payments, and credits.

9.      The XL Funding Inventory secures the entire Indebtedness of Debtor (as defined in paragraph 13, page 11 to the Note) and not merely a portion thereof.

10.     Should any of the XL Funding Inventory be sold to third party consumers in the ordinary course of Debtor's business, XL Funding's purchase money security interest in such XL Funding Inventory is extinguished as to the vehicle but attaches as to the sales proceeds.  However, nothing in the proposed interim cash collateral order contains any restrictions, safeguards or parameters that will protect such sales proceeds, which could potentially prejudice XL Funding and cause irreparable harm should such sales proceeds be used for expense other than satisfaction of XL Funding's perfected, first priority purchase security interest in XL Funding Inventory sales proceeds.

11.     Further, any delay in payment with respect to the sales proceeds associated with the XL Funding Inventory is prejudicial to XL Funding.

*Further affiant sayeth not.*

**[SIGNATURES ON NEXT PAGE]**

XL FUNDING, LLC D/B/A AXLE FUNDING

By: Edward Tremblay
Its: VP Collections

SUBSCRIBED AND SWORN TO BEFORE ME by the said Edward Tremblay, Vice President of
Collections, on this the 22nd day of February, 2022.

Notary Public for Said County and State

MELISSA JOHNSON
My Notary ID # 10667316
Expires April 15, 2023

# DEMAND PROMISSORY NOTE AND SECURITY AGREEMENT

FOR VALUE RECEIVED, each of the undersigned dealers (referred to jointly and severally herein as the "**Dealer**" which term shall mean as applicable each of the undersigned individually and all of the undersigned collectively) on behalf of themselves individually and in their representative capacities hereby jointly and severally promise to pay to the order of AUCTION CREDIT ENTERPRISES, LLC (including its successors and assigns, "**Lender**"), on demand at Lender's principal office at 14951 Dallas Parkway, Suite 200 Dallas, TX 75254 or such other place that Lender may designate in writing, all Obligations (defined below and as may be more particularly set out in the Term Sheet), including, without limitation, all principal, interest, costs, expenses and fees as provided in this Demand Promissory Note and Security Agreement (this "**Agreement**") or such greater sum as may be advanced from time to time.

## 1.    DEFINITIONS

1.1    **Defined Terms**. All capitalized terms used shall have the meaning ascribed to them in the definitions contained in Section 13 of this Agreement.

1.2    **Terms Defined in the Uniform Commercial Code**. Terms defined in the Texas Uniform Commercial Code which are not otherwise defined in this Agreement are used as defined in the Texas Uniform Commercial Code, as amended.

## 2.    LOAN

2.1    **Loan**. Subject to the terms and conditions of this Agreement, Lender may make Loans to Dealer up to the maximum principal amount of the Credit Limit. All Obligations, including, without limitation, the Loans are secured by this Agreement.

2.2    **Interest Rate**. Interest shall accrue on all Obligations as follows:

(a)    All outstanding Obligations under this Agreement shall accrue interest (based upon a 360 day year) and shall be compounded daily.

(b)    The Base Rate shall be the rate of Interest, so long as Dealer has not breached any representation, warranty, covenant or credit term required under this Agreement, or an Event of Default has not occurred and is not continuing.

(c)    If Dealer breaches any representation, warranty, covenant or credit term, the applicable rate of Interest shall be the Default Rate.

(d)    If an Event of Default occurs as defined in Section 10 of this Agreement, the applicable rate of Interest shall be the Default Rate.

(e)    The Base Rate or Default Rate may be amended or modified by Lender in Lender's sole discretion by publishing such amended or modified Base Rate or Default Rate on a rate, fee and term schedule posted at URL www.auctioncredit.com or in each Lender branch location. Lender may only increase the Base Rate or Default Rate by 50 basis points in any one 30-day period.

(f)    In the event that no Term Sheet has been executed or the Term Sheet does not include rate information, the Base Rate shall be the greater of the variable rate of interest equal to the most recent prime rate published in the Wall Street Journal or 6.75% per annum and the Default Rate shall be 12% per annum.

2.3    **Credit Terms and Procedures**. In order to secure full and prompt payment and performance of all Obligations and in consideration of and a condition to the making of any Advance to Dealer under this Agreement, the following terms and procedures shall apply:

(a)    The decision to make an Advance to Dealer is the exclusive right of Lender, and Dealer understands and agrees that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Dealer or any guarantors. Dealer is not obligated to finance any Inventory through Lender.

(b)    All Dealer requests to Lender for an Advance for the purpose of acquiring Purchase Money Inventory, or financing previously-acquired Inventory must include a copy of the bill of sale for any Unit which is the subject of the request, indicating the actual purchase price and vendor, a completed Odometer Disclosure Statement, and the Unit's original operative certificate of title showing that it has been duly assigned to Dealer. If Lender elects to make any such Advance, the Advance shall be included in the Obligations under this Agreement, with interest accruing from the earlier of the date of purchase (for auction and other direct payment arrangements) or the date of approval by Lender, in each case according to Lender's discretion and procedures for the applicable program.

(c)    Lender is not required, but may make, without notice to Dealer and without regard to the Dealer's Credit Limit, Advances on Dealer's behalf for any obligation to a third party at any time Dealer is in default under the terms of the Agreement. If Lender elects to make an Advance, the Advance shall be included in the Obligations under the Agreement, with interest accruing from the date of payment by Lender.

(d)    Dealer must be in complete compliance with this Agreement before an Advance request will be approved by Lender. Lender may also require additional information from Dealer in a sworn affidavit including, but not limited to, a statement that Dealer has not used any Advance for any other purpose than its originally requested and verified purpose.

(e)    Dealer shall pay in full in cash all Obligations to Lender at the offices of Lender, on demand and without notice, with respect to Lender-Financed Inventory on the earlier of: (a) twenty-four (24) hours from the time Dealer receives payment by or on behalf of the purchaser of an item of Lender-Financed Inventory; (b) forty-eight (48) hours after the disposition by sale or otherwise of an item of Lender-Financed Inventory; (c) the Maturity Date or (d) upon demand by Lender. Lender shall apply such payments to a Lender-Financed Inventory Obligation incurred from said item of Lender-Financed Inventory. Notwithstanding anything in this Agreement to the contrary, if, after the disposition by sale or otherwise and subsequent payment to Lender as delineated above, a Shortage exists between any payments received by Lender and the Lender-Financed Inventory Obligation with respect to an item of Lender-Financed Inventory, that Shortage shall be included in the Obligations owed by Dealer to Lender and secured with Collateral other than Lender-Financed Inventory. Dealer shall pay to Lender at the offices of Lender all other Obligations, on demand and without notice. The order and method of application of such payments of the Obligations shall be in the discretion of Lender. Payments received by Lender after 3:00 p.m. as measured by Dealer's Home Branch shall be applied the next business day.

(f)    If Dealer is in compliance with all other provisions of this Agreement, Lender may, in its sole discretion, permit an Extension of the Maturity Date relative to an item of Lender-Financed Inventory, upon the payment of Shortage, Interest, Floorplan Fee(s) and a principal reduction of the outstanding Advance relating to such item of Lender-Financed Inventory pursuant to this Agreement and as established in the Term Sheet.

(g)    So long as Dealer is not in default of this Agreement, Dealer may sell Lender-Financed Inventory to bona fide purchasers in the ordinary and regular course of Dealer's business, but nothing in this Agreement shall be deemed to waive or release any interest Lender may have under any other agreement in any Proceeds or replacements of the Lender-Financed Inventory. Upon the sale of any item of Lender-Financed Inventory, Dealer shall hold the amount received from the disposition in trust for the benefit of Lender and Dealer shall pay to Lender, in accordance with this Agreement, an amount equal to the unpaid balance of the Obligations relating to the sold item of Lender-Financed Inventory.

(h)    Dealer shall allow Lender's officers, employees, agents, attorneys, designees and representatives access to Dealer's books

and records at the Dealer's Location to conduct audits of Dealer's Lender-Financed Inventory. Dealer shall be responsible for and agrees to pay all of Lender's expenses in conducting audits.

(i)  Upon request by Dealer to obtain, for a legitimate business purpose, the Title to a specific item of Lender-Financed Inventory held by Lender, Lender may consider the request and, in Lender's sole discretion, grant such request. In the event Lender grants a request, Dealer shall deliver to Lender a check or draft which is signed and dated on the date on which the Dealer takes physical custody of the Title in an amount equal to the Obligation relating to the specific item of Lender-Financed Inventory. The subject Title must be returned to Lender within the time period established by Lender or any outstanding Obligation relating to any such Advance for such specific items of Lender-Financed Inventory shall become immediately due and payable, and Lender may deposit or present such check or draft for payment in partial or whole satisfaction.

(j)  To protect Lender's interest, Dealer authorizes Lender to obtain credit information from a credit bureau, and any financial institutions or trade creditor that Dealer has provided, as well as any other credit investigation that Lender in Lender's sole discretion deems necessary. Dealer also authorizes Lender to contact any third parties to disclose information, including information contained in the Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfection of Lender's security interest. Dealer authorizes Lender to review Dealer's account periodically, which may include obtaining additional credit reports.

(k)  All payments made by Dealer to Lender via check or ACH, at the time of issuance, must be written against or drawn upon an account that contains immediately available funds sufficient to cover the dollar amount of the check or ACH.

(l)  Dealer's account is subject to "NSF" fees in the amount stated in the Term Sheet or maximum amount permitted by law for each check or ACH issued by Dealer which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Dealer's and/or Lender's depository institution. In the event that no Term Sheet has been executed or an executed Term Sheet fails to disclose the NSF fee, the NSF fee shall be $30.00 or the maximum amount permitted by applicable law, whichever is greater.

(m)  Lender may process checks electronically, at first presentment and at any re-presentments, by transmitting the amount of the check, routing number, account number and check serial number to Dealer's financial institution. By submitting a check for payment, Dealer authorizes Lender to initiate an electronic debit from its bank account. When Lender processes Dealer's check electronically, Dealer's payment may be debited from its bank account as soon as the same day Lender receives Dealer's check and it will not receive that cancelled check with its bank account statement.

(n)  Dealer's account is subject to a late fee charge in the amount stated in the Term Sheet or the maximum amount permitted by law for any item of Lender-Financed Inventory for which Dealer fails to remit payment under this Agreement when due. Dealer acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's probable losses due to the delay, inconvenience, and administrative expenses associated with a late payment. In the event that no Term Sheet is executed or the executed Term Sheet fails to disclose the late fee, the late fee shall be the greater of 5% of the late payment or $250.00.

(o)  Lender shall be entitled to maintain and publish changes to its Term Sheet by posting the same at URL www.auctioncredit.com or in each Lender branch location. Any rates, fees and amendments to the Term Sheet published by Lender shall be incorporated in this Agreement by reference and made a part of this Agreement. Lender may amend the rates and fees from time to time at Lender's sole discretion and without additional notice to Dealer other than the publication of such amendments at URL www.auctioncredit.com or in each Lender branch location.

(p)  Dealer waives demand, presentment for payment, notice of dishonor, protest and notice of protest, and expressly agrees that the Agreement and all payments coming due under it may be extended or modified without affecting Dealer's Obligations under this

Agreement. Dealer understands that this Agreement matures upon issuance, and that Lender may, at any time, and without notice to Dealer, with or without cause, demand that the Obligations due under this Agreement be immediately paid in full. The demand nature of this Agreement does not limit Lender's election of remedies upon a default by Dealer. At Lender's option, Lender may reference a term of default for the purpose of permitting Lender to receive interest at the Default Rate. It is agreed that Lender may demand partial payments under this Agreement, and said partial demand shall not change Lender's rights under this Agreement.

(q)  Dealer shall use all Advances solely for business purposes and not for personal, family or household purposes including, without limitation, Dealer's use of Advances to purchase a vehicle to be used for Dealer's personal, family, or household purpose.

(r)  Lender, in its sole discretion, may waive a default by Dealer and assess an additional administrative fee to Dealer in the amount of $200.00 for making such accommodation, but Lender is not obligated, under any circumstances, to waive a default or make (or offer to make) any such accommodation to Dealer. Any such administrative fee assessed to Dealer shall be included in the Obligations.

**3.  SECURITY INTEREST IN COLLATERAL**

3.1  **Grant of Security Interest.** As security for the timely payment and complete performance of the Obligations, Lender and its Affiliates shall have, and the Dealer grants to Lender and its Affiliates, a first priority lien and continuing security interest in all of Dealer's assets and properties, wherever located, including, without limitation, the following Collateral:

(a)  All Accounts, Deposit Accounts, General Intangibles, Documents, Instruments, Investment Property, Chattel Paper and any other similar rights of the Dealer however created or evidenced, whether now existing or hereafter owned, acquired, created, used, or arising, specifically including, without limitation, claims, leases, agreements, license agreements, licensing fees, royalties, policies, credit insurance, guaranties, letters of credit, advices of credit, binders or certificates of insurance, deposits, documents of title, securities, security interests, licenses, goodwill, tax refunds, customer lists, franchises, franchise rights, drawings, designs, marketing rights, computer programs, artwork, databases and other business property rights, all applications to acquire rights, for which application may at any time be made by the Dealer, together with any and all books and records pertaining to those rights and any right, title or interest in any Inventory which gave rise to an Account, and all Intellectual Property throughout the world;

(b)  All Inventory, whether now existing or acquired and wherever located, specifically including, without limitation, Purchase Money Inventory now owned or acquired, and all additions, accessions, accessories, replacements, and Proceeds, together with any and all books and records;

(c)  All Equipment, vehicles, vehicle parts, Fixtures, Goods and all other tangible personal property of the Dealer of every kind or nature, whether now owned or acquired, wherever located, specifically including, without limitation, all machinery, trucks, boats, on and off the road vehicles, forklifts, tools, dies, jigs, presses, appliances, implements, improvements, accessories, attachments, parts, components, partitions, systems, carpeting, draperies and apparatus;

(d)  All products and proceeds of each of the foregoing, specifically including, without limitation:

(i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Dealer from time to time,

(ii) any and all payments of any form made or due and payable to the Dealer in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the foregoing by any Governmental Authority or any Person acting under color of Governmental Authority,

(iii) to the extent of the value of Collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the Collateral,

Initial: _RG_ _AL_

(iv) any Stock Rights, and

(v) any and all other amounts paid or payable under or in connection with any of the foregoing, whether or not in lieu the foregoing;

(e)    All renewals, extensions, replacements, modifications, additions, improvements, accretions, accessions, betterments, substitutions, replacements, annexations, tools, accessories, parts and the like now in, attached to or which may be placed in or added to any Collateral, whether or not of like kind; and

(f)    All rights, remedies, claims and demands under or in connection with each of the foregoing.

## 4.    DEALER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS

To induce Lender to enter into the Agreement and to make each and every loan and other financial accommodation, the Dealer (meaning each of the undersigned individually and all of the undersigned collectively, jointly and severally) represents and warrants to Lender that, except as may otherwise be provided in the Agreement:

4.1    **Name of Dealer**.  The exact legal name of the Dealer as it is organized and its state of organization are each correctly stated in the signature page of this Agreement. Dealer shall immediately notify Lender in writing of any change to Dealer's legal name, address, principal place of business, business type, ownership, management or control, and shall execute any document necessary at Lender's request to bring Dealer into compliance with this Agreement.

4.2    **Principals and Dealership Location**.  The Dealer's principals, and dealership location are set forth correctly in the Floor Plan Application. Dealer maintains all of its records with respect to its Accounts at the Dealership Location. Dealer has not at any time within the past four (4) months maintained its Dealership Location or its records with respect to Accounts at any other location.

4.3    **Title to Collateral**.  All Collateral is lawfully owned by the Dealer, free and clear of any prior security interest, pledge, sale, assignment, transfer or other encumbrance other than Permitted Encumbrances; the Dealer has the unencumbered right to pledge, sell, assign or transfer the Collateral subject to the Permitted Encumbrances and to subject the Collateral to the security interest in favor of Lender; except for Permitted Encumbrances, no financing statement covering all or any portion of the Collateral is on file in any public office other than in favor of Lender; and the security interest created buy this Agreement constitutes a legal and valid, first priority security interest in the Collateral.

4.4    **Business Records**.  Dealer shall keep at all times complete and accurate records of Dealer's business and financial condition as Lender may reasonably request. Dealer authorizes Lender to share the information and any other information relating to Dealer's transaction with Lender to any and all persons or parties as Lender deems necessary.

4.5    **Negative Covenants**.  Without the prior written consent of Lender:

(a)    Dealer shall not pay or declare any dividends or distributions, redeeming any capital stock, repaying subordinate debt or other loans to any principal or guarantor of Dealer, during any time an Obligation exists from Dealer to Lender.

(b)    Dealer shall not sell, transfer, lease or otherwise dispose of the Collateral, or discounting, with or without recourse, any of its Accounts, except for sales from Inventory in the ordinary course of business.

(c)    Dealer shall not create or suffer to exist any Lien upon any of the Collateral, whether now owned or hereafter acquired.

(d)    Dealer shall not enter into any consolidation or merger with, or acquisition of, any Person or sell all or any substantial portion of its assets.

(e)    Dealer shall not purchase, redeem, retire or otherwise acquire any of its outstanding equity interests.

(f)    Dealer shall not assume, guarantee or otherwise become liable as a guarantor or surety for the obligations of any Person, except (i)

the endorsements by Borrower of negotiable instruments for deposit or collection in the ordinary course of business, and (ii) those in favor of Lender.

(g)    Dealer shall not engage in any transaction with any Person other than in the ordinary course of business.

(h)    Dealer shall not change its fiscal year or any of its significant accounting policies, except to the extent necessary to comply with GAAP.

(i)    Dealer shall not make any material change in the nature of its business as of the date of this Agreement.

(j)    Dealer shall not permit any event to occur or condition to exist which has a Material Adverse Effect and shall not directly or indirectly enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder or holders of any of the equity interests of Borrower, or with any Affiliate of Borrower which is not its Subsidiary, on terms that are less favorable to Borrower or any of its Subsidiaries, as applicable, than those that might be obtained in an arm's length transaction at the time from Persons who are not such a holder or Affiliate.

(k)    Dealer shall not amend, modify or otherwise change any of the terms or provisions in any of its articles of incorporation or bylaws, articles of organization or operating agreement, or any other organic documents in effect on the date on the date of this Agreement without the prior written consent of Lender.

(l)    Dealer shall not make any advances or loans to any Affiliates.

4.6    **Permits and Licenses**.  Dealer warrants that it has obtained all necessary permits and licenses pursuant to local, state, and federal law required to operate its business as a wholesale or retail seller, lessor or renter of the Lender-Financed Inventory and has complied with all filing requirements to operate as the entity or business type on record with the appropriate governmental offices.

4.7    **No Pending Actions**.  Dealer warrants that there are no legal, arbitration, administrative or other proceedings pending or threatened against Dealer which could reasonably affect the Collateral or which materially and adversely affect the properties, business, prospects, or condition, financial or otherwise, of the Dealer or Dealer's ability to honor its Obligations.

4.8    **Guaranties**.  Dealer shall cause each owner of Dealer to execute a guaranty in a form provided by Lender in favor of Lender with respect to the Obligations. If Dealer is owned in whole or in part by a legally recognized business entity or trust, then Dealer shall cause the entity or trust to execute a guaranty in the name of the entity or trust in addition to any other required guaranties. All guarantees shall be incorporated by reference and made a part of this Agreement.

4.9    **Representations Regarding Accounts**.  Except for Permitted Encumbrances, each Account:

(a)    is a valid Account representing an undisputed, bona fide right to payment from the Account Debtor named for goods sold or leased, intellectual property licensed, or for services rendered, whether or not the right to payment has been earned by performance;

(b)    is free and clear of any agreement in which the Account Debtor may claim a deduction or discount; and

(c)    is free and clear of all set-offs or counterclaims.

4.10    **Representations Regarding Contracts and Leases**.  All leases of real or personal property and all contracts to which the Dealer is a party are in full force and effect. To the best of Dealer's knowledge, no Person is challenging or disputing the validity or enforceability of any such leases or contracts, and the Dealer is not in material default under any such leases or contracts.

4.11    **Representations Regarding Equipment and Inventory**.  Dealer has not purchased any Inventory in a transaction subject to the bulk transfer laws of any state or otherwise outside the ordinary course of the seller's business.

4.12  **Representations Regarding Consigned Goods.** Dealer does not engage in the sale of consigned goods. Dealer not a party to any consignment contracts. Dealer is not generally known by its creditors to be in the business of selling consigned goods.

5.    **Agreements Concerning Accounts**

5.1  **Location**. The Dealer will give Lender written notice of each office of the Dealer at which records of the Dealer relative to the Accounts are kept. Except where notice is given, all records of the Dealer relative to the Accounts are and will be kept at the Dealership Location.

5.2  **Schedule of Accounts**. Upon request by Lender, the Dealer will, from time to time, deliver to Lender a schedule identifying each Account ("Schedule of Accounts"), together with such schedules and certificates and reports relative to all or any of the Collateral and the items or amounts received by the Dealer in full or partial payment or otherwise, as Proceeds of any of the Collateral. Each Schedule of Accounts or other schedule, certificate or report shall be executed by its duly authorized officer and shall be in the form specified by Lender. Any Schedule of Accounts identifying any Account shall be accompanied, if Lender requests, by a true and correct copy of the invoice evidencing such Account.

5.3  **Perfection of Security Interest**. The Dealer shall take all action that may be necessary or desirable, or that Lender may otherwise reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of Lender's security interest in the Collateral or to enable Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to:

   (a)   immediately discharging all Liens other than Permitted Encumbrances;

   (b)   obtaining applicable Waivers, as Lender may reasonably request;

   (c)   delivering to Lender, endorsed or accompanied by Instruments of assignment as Lender may specify, and stamping or marking, in a manner acceptable to Lender, any and all Chattel Paper, Instruments, Letters of Credit and advices and documents evidencing or forming a part of the Collateral;

   (d)   entering into lockbox, warehousing and other custodial arrangements reasonably satisfactory to Lender;

   (e)   executing and delivering control agreements, instruments of pledge, notices, assignments and lockbox arrangements, in each case in form and substance satisfactory to Lender, relating to the creation, validity, perfection, maintenance or continuation of Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law; and

   (f)   by the signature of its authorized representative below, Dealer authorizes Lender to file against Dealer, one or more financing, continuation, or amendment statements to perfect Liens in the Collateral securing the Obligations in form and substance satisfactory to Lender (which may describe the Collateral with such words as "all assets" or other words of similar effect).

All charges, expenses, fees and costs Lender may incur in perfecting, maintaining and perfecting its security interests and any taxes relating to these activities, shall be charged to the Dealer, added to the Obligations, or, at Lender's option, shall be paid to Lender immediately upon demand. Dealer shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Lender's security interest and shall cause its Financial Statements to reflect Lender's security interest.

5.4  **Assignment of Security Interests**. If, at any time the Dealer shall take and perfect a security interest in any property of an Account Debtor or any other Person to secure payment or performance of an Account, the Dealer shall promptly assign that security interest to Lender.

5.5  **Collateral Stamps**. Upon Lender's request, all Collateral comprised of promissory notes and related collateral and loan documents of which Dealer is the holder shall be endorsed by Dealer to Lender (by allonge or otherwise), and Dealer shall conspicuously stamp (the "Stamp") on the face of such Collateral that they are collateral for and secure the Obligations. The Stamp shall be in the following form:

This instrument is assigned and pledged as collateral to Auction Credit Enterprises, LLC to secure the payee's indebtedness. This instrument may not be sold, transferred, pledged, or hypothecated without the prior consent of Auction Credit Enterprises, LLC. The assignment and pledge is memorialized by a Demand Promissory Note and Security Agreement.

6.    **AGREEMENTS CONCERNING CERTAIN COLLATERAL**

6.1  **After-Acquired Intellectual Property**. If the Dealer obtains rights to any new Intellectual Property, the provisions of this Agreement shall automatically apply. With respect to any new applications for Intellectual Property, the issuance of any new registration for Intellectual Property, and any renewals or extensions, the Dealer shall give Lender prompt written notice in writing.

6.2  **Supplemental Documentation**. Concurrently with the execution of this Agreement, and upon request of Lender, the Dealer shall execute and deliver to Lender supplemental agreements relating to any registered patents, trademarks, tradenames, copyrights and applications, in a form satisfactory to Lender and suitable for recording in the records of the registering Governmental Authority.

6.3  **Contracts and Leases**. The Dealer shall perform, when due, each of its obligations under all contracts, leases and other agreements (including, without limitation, all license agreements) to which the Dealer is a party, and, immediately upon learning of any material default by any party under any such contract, lease or other agreement, the Dealer shall give written notice to Lender, together with a description as to the nature and status. After the occurrence of any Default or Unmatured Default, the Dealer shall not amend, modify, supplement or otherwise agree to any change in any contract, lease or other agreement or waive any provision, without the prior written consent of Lender.

6.4  **Deposit Accounts**. The Dealer will, upon Lender's request:

   (a)   cause each bank or other financial institution in which it maintains:

      (i) a Deposit Account to enter into a control agreement with Lender, in form and substance satisfactory to Lender in order to give Lender Control of the Deposit Account or

      (ii) other deposits (general or special, time or demand, provisional or final) to be notified of the security interest granted to Lender hereunder and cause each such bank or other financial institution to acknowledge such notification in writing; and

   (b)   deliver to each bank or financial institution a letter, in form and substance acceptable to Lender, transferring ownership of the Deposit Account to Lender or transferring dominion and control over each other deposit to Lender.

6.5  **Letter-of-Credit Rights**. The Dealer will, upon Lender's request, cause each issuer of a letter-of-credit to consent to the assignment of Proceeds of the letter-of-credit in order to give Lender Control of the letter-of-credit rights.

6.6  **Uncertificated Securities**. The Dealer will permit Lender to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities which are Collateral to mark their books and records with the numbers and face amounts of all uncertificated securities and rollovers and replacements to reflect the Lien of Lender granted pursuant to this Agreement. The Dealer will take any actions necessary to cause the issuers of uncertificated securities which are Collateral and which are Securities to cause Lender to have and retain Control over pledged securities.

7.    **AGREEMENTS CONCERNING INVENTORY**

7.1  **Locations**. Dealer shall keep Lender-Financed Inventory only at its Dealership Location and shall not remove Lender-Financed Inventory for a period exceeding twenty-four (24) hours, unless such item of Lender-Financed Inventory is the subject of a daily rental agreement, rent-to-own agreement, lease here/pay here agreement, retail installment sales contract, or otherwise authorized in writing by Lender.

**7.2  Sales of Inventory.**  Dealer shall sell, lease, or rent Lender-Financed Inventory only in the ordinary course of the Dealer's business and not dispose of such Lender-Financed Inventory, except as provided in this Agreement.

**7.3  Condition of Inventory; Insurance.**  Dealer shall keep all Inventory in good order and condition and shall maintain full, accurate and complete books and records with respect to respect at all times.  Dealer shall keep all Lender-Financed Inventory insured against all physical risks in amounts and under policies issued by an insurance company as are deemed necessary and satisfactory to Lender.  Dealer shall be named a "loss payee" on all policies to the extent Lender's interest may apply.  In the event Dealer fails to procure, maintain or provide proof of insurance coverage, Lender may, in its sole discretion, purchase insurance necessary to protect its interest and collect the costs from Dealer.  Dealer shall keep Lender-Financed Inventory held for rent-to-own or lease here/pay here covered by an adequate service contract or warranty acceptable to Lender and shall keep Lender-Financed Inventory equipped with a global positioning system unit that is acceptable to Lender and is in working condition at all times.

**7.4  Warehousemen and Landlords.**  Dealer shall not store any material portion of its Inventory with any bailee, warehouseman, or similar party without Lender's prior written consent.  If Inventory is so stored, Dealer will, concurrently with storing such Inventory, cause the bailee, warehouseman, or similar party to issue and deliver to Lender, in a form acceptable to Lender, warehouse receipts in Lender's name evidencing the storage of the Inventory.  The Dealer shall provide Lender with copies of all agreements between the Dealer and any bailee, warehouseman, or similar party and deliver to Lender a landlord's or warehouseman's lien waiver in a form acceptable to Lender, prior to entering into any material lease for warehouse storage or business facilities.

**7.5  Consigned Inventory.**  If at any time any of the Inventory is placed by the Dealer on consignment with any consignee, Dealer shall, prior to delivery of such consigned Inventory:

(a)   provide Lender with all consignment agreements and other Instruments and documentation to be used in connection with such consignment (all of which shall be in a form acceptable to Lender);

(b)   prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the consignee as debtor, the Dealer as secured party, and Lender as assignee of the secured party;

(c)   prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the Dealer, as debtor, and Lender, as secured party;

(d)   conduct a search of all UCC filings made against the consignee and all jurisdictions in which Inventory to be consigned is to be located while on consignment, and furnish copies of such results to Lender; and

(e)   notify in writing all creditors of the consignee that are or may be holders of security interests in the Inventory to be consigned that the Dealer expects to deliver certain Inventory to the consignee in a form acceptable to Lender.

(f)   appoint, at Lender's sole discretion, Lender through Lender's authorized employees and agents, to act as Dealer's agent to fill out, complete and sign all papers and documents that may be necessary or helpful to complete items listed in subsections (b) - (e); however, nothing herein shall negate Dealer's responsibility to insure the correct filing of the appropriate financing statements to protects its rights in the Inventory or to execute the appropriate consignment agreements, and Dealer hereby holds Lender harmless for any negligence in Lender's execution of the items listed in subsections (b)-(e) or in providing consignment agreements to Dealer that may be acceptable to Lender.

**7.6  Inspection.**  Dealer shall allow Lender and its representatives to inspect the Lender-Financed Inventory during normal business hours and at other reasonable times and to inspect and make copies of Dealer's books and records.  Dealer shall pay Lender upon demand for the costs and expenses incurred by Lender or its representatives for such inspections of Dealer's books and records and audits of Dealer's Lender-Financed Inventory.

**7.7  Trust Account.**  Dealer shall hold as a fiduciary all amounts received from the sale of Lender-Financed Inventory in the form as received in trust for the sole benefit of Lender and shall remit funds satisfying all amounts due and owing Lender for the sold item of Lender-Financed Inventory within twenty-four (24) hours of receipt of said funds.

**7.8  Compliance with Law.**  Dealer shall substantially comply in all material respects with all federal, state and local laws, regulations, rulings and orders applicable to the Dealer for its assets or business in all respects.  Without limiting the generality of the foregoing, Dealer shall comply with all requirements of the federal Fair Labor Standards Act, as amended, in the conduct of its business.  Dealer shall notify Lender immediately of any violation by Dealer of the Fair Labor Standards Act.

**8.      AGREEMENTS CONCERNING EQUIPMENT AND FIXTURES**

**8.1  Equipment Locations.**  Dealer will give Lender written notice of each location at which Equipment is or will be kept at all times.

**8.2  Equipment Condition.**  The Dealer will keep the Equipment in good order and repair, ordinary wear and tear accepted, and will not waste or destroy the Equipment or any portion thereof, except in the case of obsolete Equipment which is no longer used or useful in Dealer's business.

**8.3  Titled Equipment.**  If Dealer has or acquires any vehicles, aircraft, watercraft, or other Equipment for which a certificate of title has been issued by a Governmental Authority, the Dealer shall immediately deliver to Lender, properly endorsed, each certificate of title or application for title or other evidence of ownership for each item of Equipment, and the Dealer shall take all actions necessary to have Lender's security interest properly recorded on each certificate of title and shall take all other steps necessary to perfect Lender's security interest in the Equipment.

**8.4  Compliance with Laws.**  The Dealer will not use the Equipment in violation of any statute, rule, regulation or ordinance or any policy of insurance.  Dealer will neither use the Equipment nor permit the Equipment to be used, for any unlawful purpose or contrary to any statute, law, ordinance or regulation relating to the registration, use, operation or control of the Equipment.

**8.5  Transfers of Equipment.**  Dealer may from time to time substitute Equipment, provided that:

(a)   the substituted Equipment is not subject to any lien or other encumbrance and has a fair market value at least equal to the fair market of the Equipment for which it is substituted;

(b)   the marketability and operating integrity of Dealer's Equipment after such substitution is not impaired;

(c)   the Equipment substituted for is no longer used or useful in the operation of Dealer's business and is sold in arm's length transaction in exchange for money or monies' worth at least equal to the fair market value of such Equipment substituted for; and

(d)   no Default or Unmatured Default has occurred and is continuing.

**8.6  Fixtures.**  The Dealer shall not permit any item of Equipment to become a fixture to real estate or an accession to any other property not subject to Lender's security interest without the prior written consent of Lender.  If any Equipment is or will be attached to real estate in such a manner as to become a fixture and the real estate is encumbered, the Dealer will obtain from the holder of the encumbrance a written consent and subordination to the security interest granted, or a written disclaimer of any interest in the Collateral, in a form acceptable to Lender.

**9.      GENERAL PROVISIONS CONCERNING COLLATERAL**

**9.1  Title to After-Acquired Collateral.**  All Collateral acquired after the date of the Agreement will be acquired by the Dealer free and clear of any lien, security interest or encumbrance, except Permitted Encumbrances.

**9.2  Further Assurances.**  The Dealer agrees to do such reasonable acts and things and deliver or cause to be delivered such other Documents as Lender may deem necessary to establish and maintain a valid security interest in the Collateral (free of all other liens and claims except Permitted Encumbrances) to secure the payment and performance of the Obligations and to defend title to the Collateral against any Person claiming any interest

therein adverse to Lender.  The Dealer authorizes Lender, at the expense of the Dealer, to execute and file a financing statement or statements on its behalf in those public offices deemed advisable or necessary by Lender to protect the security interests of Lender.  If permitted by law, the Dealer agrees that a reproduction of this Agreement or of a financing statement may be filed with the financing statement.

9.3  **Insurance.**

(a)    The Dealer shall have and maintain at all times, with respect to Inventory and Equipment, insurance written by companies acceptable to Lender covering risks customarily insured against by companies engaged in business similar to that of the Dealer in reasonable amounts, containing terms customarily maintained by companies engaged in business similar to that of the Dealer.  Such insurance shall be payable to the Dealer and Lender as their interests may appear.

(b)    In addition to the insurance requirements set forth in Section 9.3(a), the Dealer will carry any other insurance and amounts for periods as may be reasonably required by Lender, and will deliver to Lender, not less than five (5) days prior to the expiration of any policy of insurance, renewals or new policies in like amounts covering the same risks.

(c)    All insurance policies shall carry standard, non-contributory lender's loss payable clauses and breach of warranty endorsements in favor of Lender.  The insurance certificates evidencing the Dealer's compliance shall be deposited with Lender, and in the event the Dealer fails to file and maintain insurance, Lender may, at its option, purchase insurance and the cost of that insurance shall become an Obligation secured by this Agreement and all sums expended shall bear interest at the Default rate of interest set forth in the Agreement until paid.  If requested by Lender, the Dealer shall deliver certified copies of the policies to Lender.  The Dealer shall pay all insurance premiums promptly when due and shall provide substitute policies of insurance should Lender at any time reject, for reasonable cause, any such policies of insurance furnished by the Dealer.  The Dealer assigns to Lender the Proceeds of all insurance, including, without limitation, any premium refunds, to the extent of the Obligations, shall direct the insurer to make payment of any losses or refunds directly to Lender and appoints Lender its attorney-in-fact to endorse any draft, check or other form of payment made by its insurers.

9.4  **Collection of Collateral.**  The Dealer will, at its own expense, collect all amounts due with respect to any Collateral including taking action with respect to collection as Lender may reasonably request or, in the absence of such request, as the Dealer may deem advisable.

9.5  **Lender May Defend Title**.  In the event the Dealer fails to pay any taxes, assessments, premiums, or fees, or fails to discharge any liens or claims against the Collateral required to be paid or discharged by the Dealer, or fails to purchase, maintain and file with Lender any insurance required by this Agreement, or if any insurance is inappropriate to the situation, in Lender's reasonable discretion, Lender may, without demand or notice, pay any taxes, assessments, premiums or fees, or pay, acquire, satisfy or discharge any liens or claims asserted against the Collateral (without any obligation to determine the validity thereof), or purchase any insurance.  All sums expended by Lender shall become an Obligation secured by this Agreement and shall bear interest at the highest default rate of interest set forth in the Agreement until paid.

9.6  **Negotiable Collateral**.  If any Collateral, including Proceeds, consists of a letter of credit, advice of credit, certificate of deposit, negotiable instrument, chattel paper or similar property, the Dealer shall, immediately upon receipt, endorse and assign the Collateral to Lender, deliver actual physical possession to Lender and prior to delivery, shall hold property in trust for Lender.  The Dealer will give Lender written notice each time it acquires additional negotiable Collateral.

9.7  **Contracts**.  The Dealer shall remain liable to perform its obligations under any contracts included in the Collateral as though this Agreement had not been entered and Lender shall not incur any obligation under any contracts by reason of this Agreement.

9.8  **Accounting System**.  Dealer shall maintain a system of accounting acceptable to Lender and in accordance with GAAP which contains information pertaining to the Collateral that may from time to time be requested by Lender.

9.9  **Inspection of Collateral and Records**.  During Dealer's usual business hours, Lender may inspect and examine the Collateral and check and test the same as to quality, quantity, value, and condition.  Lender shall also have the right at any time, during Dealer's usual business hours or during the usual business hours of any third party having control over the records of the Dealer, to inspect Dealer's books and records in order to verify the amount, condition of or any other matter relating to the Collateral and Dealer's financial condition and to copy Dealer's books and records.  Dealer waives the right to assert a confidential relationship, if any, it may have with any accounting firm in connection with any information requested by Lender and agrees that Lender may directly contact any accounting firm in order to obtain information.

9.10  **Transfer of Collateral**.  Dealer shall not sell, lease, license, transfer or otherwise dispose of any interest in any Collateral except:

(a)    sales of Inventory in the ordinary course of business,

(b)    licenses and other dispositions of Intellectual Property in the ordinary course of business pursuant, and

(c)    dispositions of Equipment in accordance with Section 8.5.

**10.    EVENTS OF DEFAULT**

10.1  **Events of Default.**  The occurrence of any of the following events shall be considered an Event of Default:

(a)    The Dealer fails to perform any of its Obligations, undertakings, or covenants under this Agreement, including, but not limited to, failing to make an installment of principal or interest under this Agreement when due or upon demand; or

(b)    Any warranty or representation made by the Dealer is found to have been false or misleading in any material respect when made, or any schedule, certificate, Financial Statement, report, notice, or other writing furnished by the Dealer to Lender is found to have been false or misleading in any material respect when made or delivered; or

(c)    Any damage or destruction of a part of the collateral securing this Agreement occurs and appropriate insurance naming Lender as "Loss Payee" is not in place; or

(d)    The Dealer or any Guarantor becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due; or the Dealer applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for the Dealer or any property of the Dealer, or makes a general assignment for the benefit of creditors; or, in the absence of an application, consent or acquiescence, a trustee, receiver or other custodian is appointed involuntarily for the Dealer or for a substantial part of the property of the Dealer; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceedings is commenced in respect of the Dealer; or

(e)    Any material change in management, ownership, or control of the Dealer occurs without the prior written consent of Lender; or

(f)    The voluntary or administrative dissolution, death, incompetency, change of ownership or control of the Dealer or any Guarantor; or

(g)    Any Guarantor shall terminate or repudiate any guaranty, or if any guaranty should be declared unenforceable or shall no longer be in full force and effect; or

(h)    The occurrence of a Material Adverse Effect; or

(i)    Lender, in good faith, deems itself insecure for any reason; or

(j)    Dealer breaches any term or provision of this Agreement.

## 11.   REMEDIES

**11.1   Remedies Generally.** Upon the occurrence of any Event of Default and at any time after an Event of Default, Lender may, at its option and without notice exercise any and all of its rights in a separate, successive or concurrent fashion and such exercise of any right shall not preclude pursuit of other rights and remedies at a later time.

**11.2   Acceleration.** Lender shall have the right to demand immediate payment of the Obligations under the Agreement and this Agreement and all other Indebtedness owed to Lender by Dealer.

**11.3   Power of .** Lender shall have all rights and remedies available at law or in equity including, without limitation, the rights and remedies of a secured party under the Texas Uniform Commercial Code, as in effect from time to time (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including, without limitation, the right to take possession of the Collateral, and for that purpose Lender may, so far as the Dealer can give authority, enter upon any premises on which the Collateral may be situated and remove the Collateral. At Lender's request and to the extent Dealer may lawfully do so, Dealer shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient to Lender and Dealer, such items of Collateral as Lender may deem sufficient to cover all of Dealer's Obligations to Lender. Dealer agrees that the Collateral is of the type customarily sold on a recognized market and that Lender has no obligation to notify Dealer prior to a sale. Dealer agrees that ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made is reasonable. Dealer agrees that private sale of any item financed by Lender at the amount owed to Lender on that item, less costs reasonably incurred by Lender in preparation of disposition of the Collateral, shall constitute a commercially reasonable method of disposition of that Collateral. Lender may in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income and hold the same as security for Obligations or apply it on principal or interest due on Obligations. In the event that Lender takes possession of any Intellectual Property, the goodwill associated with any trademarks, tradenames, trade dress, and service marks of the Dealer shall be transferred to Lender.

**11.4   Advances and Deposits.** Lender shall have the right to cancel any unfunded Advances. Any Deposit Accounts, deposits or other sums credited by or due from Lender to the Dealer shall constitute security for the Obligations, and Lender may apply or set-off deposits or other sums against Obligations at any time a Default has occurred and is continuing, and whether or not the Obligations are then due or other Collateral is considered by Lender to be adequate.

**11.5   Receivership.** Lender shall have the right to initiate proceedings to appoint a receiver in any court of competent jurisdiction. Dealer waives the right to notice and hearing of the appointment of a receiver and consents to the appointment without requiring Lender to post a bond.

**11.6   Claims on Bonds.** To the extent allowed by law, Dealer gives consent to Lender to proceed in any action to collect on or execute against any bonds that Dealer has posted with any governmental authorities.

**11.7   Waiver.** Except as otherwise expressly set forth in this Agreement, to the extent permitted by law, the Dealer waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance and all other demands and notices of any description. Additionally, to the extent not prohibited by law, Dealer waives all appraisement, valuation, anti-deficiency, homestead, exemption, or usury laws and releases all right to appeal after payment in full. With respect to both the Obligations and Collateral, the Dealer assents to any Extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payments and any settlement, compromise or adjustment, all in such manner and at such time or times as Lender may deem advisable. Except as otherwise provided by law, Lender shall have no duty as to the collection or protection of the Collateral, or any income it generates, nor as to the preservation of rights against prior parties nor as the preservation of any

rights pertaining beyond safe custody. Lender may exercise its rights with respect to Collateral without resorting or regard to other Collateral or sources of reimbursement for any Obligation. Lender shall not be deemed to have waived any of these rights upon or under Obligations or Collateral unless the waiver be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of that right or any other right. A waiver on any occasion shall not be construed as a bar to the exercise of any right on any future occasion. All rights and remedies of Lender as to the Obligations or Collateral whether evidenced the Agreement or by any other instrument or papers shall be cumulative and may be exercised alone, successively or together. Lender may, from time to time, without notice to the Dealer:

(a)   Retain or obtain a security interest in any property of any other Person, in addition to the Collateral, to secure any of the Obligations;

(b)   Retain or obtain the primary or secondary obligation of any party or parties, in addition to the Dealer with respect to any of the Obligations;

(c)   Extend or renew for any period (whether or not longer than the original period) or release or compromise any Obligation of any party or parties primarily or secondarily liable to Lender under the Agreement;

(d)   Release its security interest in any of the property securing any of the Obligations and permit any substitution or exchange for any such property; and

(e)   Resort to the Collateral for the payment of any of the Obligations whether or not it shall have resorted to any other property or shall have proceeded against any party primarily or secondarily liable for any of the Obligations.

Lender shall not have any Obligation for any error or omission or delay of any kind occurring in the liquidation of any Collateral, including the settlement of or the collection of any Account or for any damage resulting from collection or settlement except liabilities resulting from willful misconduct by Lender.

**11.8   Expenses.** The Dealer shall pay to Lender on demand any and all reasonable out-of-pocket expenses and costs, including reasonable attorneys' fees, incurred or paid by Lender in protecting the Collateral, the existence, perfection or priority of Lender's security interest, or the enforcement of any of the Loan Documents.

**11.9   Proceeds.** Lender may take control of any funds generated by the Collateral, and in Lender's name or the Dealer's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose or realize upon any Collateral. After deducting all expenses, the residue of any Proceeds of collection or sale of the Collateral shall be applied to the payment of principal or interest on the Obligations in such order of preference as Lender may determine, proper allowance for interest on the Obligations not then due being made, and any excess shall be returned to the Dealer.

**11.10 Power of Attorney.** The Dealer irrevocably appoints Lender and Lender's designees as its true and lawful attorneys-in-fact, with full power of substitution in the premises to act with or without the occurrence of a Default and with or without notice to Dealer to:

(a)   act with general authority and delegate such authority with respect to all Dealer's Collateral and all transactions relating thereto;

(b)   execute agreements and related Documents necessary for Dealer to acquire or sell Collateral;

(c)   endorse any document, instrument, certificate of title or other evidence of title, state registration Documents, or related Documents necessary to protect the Collateral in the name of Dealer;

(d)   demand, collect receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral or Chattel Paper related to the Collateral or any insurance claims thereon in such manner as Lender may determine, whether or not the Collateral is then due;

(e)   receive, open, and dispose of mail addressed to the Dealer;

(f)    endorse in the name of and on behalf of Dealer any Chattel Paper, invoice, bill of sale, document, instrument or bill of lading relating to the Collateral;

(g)    sign and send on behalf of the Dealer any invoice or bill of lading relating to any Account, on drafts against customers, on schedules and assignments of Accounts, on notices of assignment, financing statements and other public records, on verifications of Accounts and on notices to customers;

(h)    sign the Dealer's name to proofs of claim against any Account Debtor on behalf of the Dealer;

(i)    notify the post office to change the address for delivery of the Dealer's mail to an address designated by Lender;

(j)    endorse Dealer's name on all applications, Documents, papers, certificates and Instruments necessary or expedient for Lender to use the Intellectual Property, or necessary or expedient to grant or issue any exclusive or nonexclusive license under the Intellectual Property to anyone else, or necessary or expedient for Lender to assign, pledge, convey or otherwise transfer title in, or dispose of, the Intellectual Property to anyone else, for the purpose of recording, registering, filing or accomplishing any other formula with respect to the Intellectual Property; and

(k)    do all things necessary to satisfy Dealer's obligations, Obligations and carry out this Agreement.

The Dealer ratifies and approves all acts of Lender's attorneys. Neither Lender nor any attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law, absent gross negligence, bad faith or wilful misconduct. This power, being coupled with an interest, is irrevocable until the Obligations have been fully satisfied. Notwithstanding anything to the contrary, no attorney acting pursuant to this Section 11.10 shall have any authority to confess judgment on behalf of the Dealer.

11.11    **License**. Dealer grants to Lender a license to use, without charge, Dealer's Intellectual Property and other Collateral in completing production of, advertising for sale, or selling any Collateral after any Default, and all of the Lender's rights under all licenses and franchise agreements shall, in such event, inure to Lender's benefit. In addition, the Dealer shall, upon request by Lender, make available such personnel in Dealer's employ on the date of any Default as Lender may reasonably designate to permit Lender to continue, directly or indirectly, to produce, advertise and sell the Collateral sold by the Dealer under any Intellectual Property or license. The license shall include the right of Lender to use, assign, license or sublicense any of the Dealer's Intellectual Property, including in the license reasonable access as to all media in which any of the licensed items may be recorded or stored; *provided that,* Lender shall comply with all pre-existing quality control standards and trademark use requirements of the Dealer. No agreements entered into by the Dealer shall prohibit, restrict or impair the rights of Lender granted hereunder.

11.12    **Reinstatement**. If, at any time after payment in full by the Dealer of all Obligations and termination of Lender's security interest, any payments on the Obligations previously made by the Dealer or any other Person are disgorged by Lender for any reason whatsoever, including, without limitation, the insolvency, bankruptcy or reorganization of the Dealer or such Person, this Agreement and Lender's security interests shall be reinstated as to all disgorged payments as though such payments had not been made, and the Dealer shall sign and deliver to Lender all Documents, and shall do such other acts and things, as may be necessary to perfect Lender's security interest.

11.13    **No Marshaling**. The Dealer, on its own behalf and on behalf of its successors and assigns, expressly waives all rights, if any, to require a marshaling of assets by Lender or to require Lender's first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion.

11.14    **Other Rights**. To the extent Lender has any rights and remedies against Dealer pursuant to any other agreements between Lender and Dealer, those rights and remedies shall be in addition to, not in lieu of, the rights and remedies provided for under this Agreement.

12.    **MISCELLANEOUS PROVISIONS**

12.1    **Assignment**. This Agreement may be assigned by Lender but Dealer may not assign this Agreement without the prior written consent of Lender.

12.2    **Amendment, Modification and Merger.** This Agreement and all documents incorporated by reference are intended by the parties as an amendment and restatement of any prior agreements between Lender and Dealer. With the exception of the Lender's right to make amendments and modifications to the terms and conditions set forth above, this Agreement may not be modified or amended except upon the written consent of Lender and Dealer.

12.3    **Execution.** The parties understand and agree that Lender may execute this Agreement and all corresponding Documents by affixing an authorized Lender Officer's signature via signature stamp. Dealer may only execute this Agreement by original signature. A facsimile or other electronic reproduction of such authorized Lender Officer's signature and Dealer's signature on the Agreement and all corresponding Documents shall be deemed original signatures.

12.4    **Notices.** All notices, requests and demands to or upon the respective parties, including service of process of any legal proceeding initiated by either party, shall be deemed to have been duly given or made: if by hand or by facsimile, immediately upon the Business Day of receipt, if received before 3:00 p.m., recipient's time, otherwise on the next Business Day; if by Federal Express, Express Mail or any other overnight delivery service with proof of next day delivery on a Business Day, one (1) Business Day after dispatch; and if mailed by certified mail, return receipt requested, five (5) days after mailing. All notices, requests and demands are to be given or made to the Dealer at the address disclosed in the Term Sheet and to Lender at 14951 Dallas Parkway, Suite 200, Dallas, TX 75254, or such other address as Lender may specify in writing from time to time.

12.5    **No Waiver.** No failure or delay by Lender in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege.

12.6    **Termination.** No termination of this Agreement shall alter Dealer's Obligations relating to amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including without limitation, the security interest and the rights of Lender as a secured party, shall extend until all Obligations owed by Dealer to Lender have been satisfied.

12.7    **Acceptance and Governing Law.** This Agreement shall not be effective unless and until accepted by execution by an officer of Lender at the address in the State of Texas set forth in the first sentence of this Agreement. This Agreement and all rights and obligations, including matters of construction, validity and performance, shall be governed by the Uniform Commercial Code and other applicable laws of the State of Texas, without regard to conflict of law principles. However, in the event Dealer's Location is in the State of California, the validity, enforceability and interpretation of the Note and this Guaranty shall be governed by the laws of the State of California without regard to conflicts of laws provisions thereof; and each Advance shall be deemed made pursuant to and under the authority of a license issued under the California Finance Lenders Laws.

12.8    **Legal Fees and Collection Costs.** In addition to principal and other charges, Dealer shall pay to Lender all reasonable legal fees, expenses and collection costs incurred as a result of Dealer's Default or failure to perform any Obligation under this Agreement.

12.9    **Indemnification.** Dealer shall indemnify and hold Lender harmless from and against all loss, damage, costs, or expenses of any nature relating to claims of third parties arising from or in any way connected to this Agreement or Dealer's business affairs including, without limitation, attorneys' fees and expenses incurred both in the defense of any action against Lender and in any action to enforce these indemnity rights as against the Dealer.

12.10    **No Joint Venture or Partnership.** Nothing contained in this Agreement shall confer upon Lender or Dealer any interest in, or subject either of them to any obligation for, or in respect of the business, assets,

profits, losses or obligations of the other. This Agreement does not constitute and shall not be characterized as a joint venture or partnership between Lender and Dealer. Nothing in this section shall limit or restrict the respective obligations and undertakings of Lender and Dealer hereunder.

**12.11 Priority.** Unless otherwise expressly provided, the security interest created by this Agreement shall be pari passu with any prior security interests in the Collateral now existing in favor of Lender.

**12.12 Reserve Account.** If disclosed in the Term Sheet, the Dealer shall be required to maintain a Reserve Account with Lender as additional security for performance of Dealer's obligations. The funds maintained in the Reserve Account shall be returned to Dealer within thirty (30) days after the later of receipt of written request for return by Lender or satisfaction of Dealer's Obligations to Lender and termination of this Agreement by Dealer. The reserve amount per Advance will be a set dollar amount as set forth on the Term Sheet. In the event that no Term Sheet is executed or the executed Term Sheet fails to disclose the reserve amount, the reserve amount shall be $75.00 per Advance.

**12.13 Set-Off.** Lender is authorized at any time, without notice to Dealer, to set-off and apply, directly or through any of Lender's affiliates any deposits (whether general or special, time or demand, provisional or final) and other assets and properties at any time held in the possession, custody or control of Lender or its affiliates or any indebtedness owed Dealer by Lender or its affiliates, towards any of Dealer's Obligations.

**12.14 Statement of Accounts.** Any statement of Dealer's account furnished to Dealer by Lender, to the extent no objection is made in writing by Dealer within thirty (30) days after receipt of such statement, shall constitute a definitive statement of Dealer's Obligations as of the date of the statement and shall be binding upon the Dealer.

**12.15 Competency.** Dealer and all Guarantors are competent to enter into this Agreement and have the legal authority to enter into and execute this Agreement and all other Loan Documents.

**12.16 Confidentiality.** Dealer shall not disclose to any third party, without the prior written consent of Lender, any terms and conditions applicable to this Agreement, regardless of where the terms and conditions appear.

**12.17 Communications.** Dealer expressly authorizes and agrees to accept all mailings, facsimile transmissions and telephonic transmissions from Lender including, without limitation. credit information and promotional materials. Dealer may establish an account with Lender where information can be accessed and transmissions can be sent through Lender's website. Dealer shall have the means to control access to the account information by passwords and a dealer account number in accordance with the policies and procedures set forth by Lender. To participate, Dealer shall execute all Documents required by Lender to register for such additional service and shall abide by Lender's policies and procedures. Dealer agrees that the online documents shall be incorporated by reference and made a part of this Agreement.

**12.18 Severability.** Whenever possible each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of that prohibition without invalidating the remainder of the provision or the remaining provisions of this Agreement. The Dealer recognizes that Lender has relied on this Agreement in extending credit to the Dealer and agrees that such reliance by Lender shall be sufficient consideration for this Agreement.

**12.19 Binding on Successors.** The rights and privileges of Lender shall inure to the benefit of its respective successors and assigns.

**12.20 Jurisdiction and Venue.** Dealer submits to the personal jurisdiction and venue of the state or federal courts of Dallas County, Texas and agrees that any and all claims or disputes pertaining to this Agreement or to any matters arising out of or related to this Agreement initiated by Dealer against Lender shall be brought in the state or federal courts located in Dallas County, Texas. Further, Dealer expressly consents to jurisdiction and venue of the state or federal courts in located in as to any action brought in such court by Lender and waives any claim of inconvenient forum. Lender reserves the right to initiate and prosecute any action against Dealer in any court of competent jurisdiction, and Dealer

consents to the forum as Lender may elect.

**12.21 Waiver of Bond.** Dealer waives, to the extent permitted by law, any bond or surety or security on such bond which might, but for this waiver, be required of Lender.

**12.22 WAIVER OF JURY TRIAL.** LENDER AND DEALER, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY, VOLUNTARILY, INTENTIONALLY. IRREVOCABLY AND UNCON¬DITIONALLY WAIVE ANY RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF EITHER OF THEM. NEITHER LENDER NOR DEALER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY EITHER LENDER OR DEALER EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY BOTH OF THEM. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ACCEPT THIS AGREEMENT.

**12.23 LIMITATIONS OF LIABILITY.**UNDER NO CIRCUMSTANCES WILL LENDER OR ANY OF ITS AFFILIATES BE LIABLE TO DEALER OR ANY OF ITS AFFILIATES OR GUARANTORS FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE, EXEMPLARY, OR SIMILAR DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUES OR PROFITS, OR DAMAGES FOR LOSS OF BUSINESS), EVEN IF ONE OR MORE OF LENDER OR ITS AFFILIATES ARE ADVISED BEFOREHAND OF THE POSSIBILITY OF SUCH DAMAGES. DEALER AGREES THAT THE AGGREGATE LIABILITY OF LENDER AND ITS AFFILIATES, COLLECTIVELY, TO DEALER AND ITS AFFILIATES AND GUARANTORS IN CONNECTION WITH ANY CLAIMS OR CAUSES OF ACTION THAT THEY MAY ASSERT, SHALL IN NO EVENT EXCEED THE AMOUNT OF PRINCIPAL, INTEREST, FEES AND COSTS PAID BY DEALER TO LENDER DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE LAST EVENT GIVING RISE TO THE CLAIM OR CAUSE OF ACTION BEING ASSERTED. BECAUSE SOME STATES/JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SOME OF THESE LIMITATIONS MAY NOT APPLY TO DEALER OR ITS AFFILIATES OR GUARANTORS.

**12.24 Interest and Fees Not to Exceed Maximum Permitted by Law.** Notwithstanding any provisions of this Agreement to the contrary, at no time shall Dealer be obligated to pay interest at a rate which would subject Lender to either civil or criminal liability or which could cause the terms of this Agreement to be void due to interest (or any fees deemed to be included for the purpose of calculating whether Dealer's rate of interest exceeded the maximum lawful rate or otherwise deemed excessive by statute or trier of fact) being in excess of the maximum rate Lender is permitted by law to contract or Dealer is permitted by law to agree to pay. In such circumstances, the rate of interest hereunder (and any fees paid that are deemed to be included in the calculation thereof) shall be deemed to be immediately reduced to such maximum rate, and such interest and the portion of all prior interest payments (and prior payments of any fees, if applicable) in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Obligations as of the date such payment was made. Any such excess shall be held by Lender for Dealer's benefit without interest and shall be subject to setoff by Lender.

**12.25 NO RELIANCE ON REPRESENTATIONS OR NON-DISCLOSURES.** DEALER REPRESENTS, ACKNOWLEDGES, AND AGREES THAT, IN ENTERING INTO THIS AGREEMENT (A) DEALER IS NOT RELYING ON ANY INDUCEMENT, REPRESENTATION, STATEMENT, PROMISE, OR AGREEMENT OF LENDER, OR LENDER'S EMPLOYEES, REPRESENTATIVES, AND AGENTS, THAT IS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT, AND (B) ANY FAILURE BY LENDER OR LENDERS

EMPLOYEES, REPRESENTATIVES, OR AGENTS TO DISCLOSE ANY INFORMATION OR DOCUMENTS ABOUT LENDER OR THIS AGREEMENT'S SUBJECT MATTER IS OF NO CONSEQUENCE BECAUSE DEALER HAS RELIED SOLELY ON THE ADVICE OF DEALER'S OWN ATTORNEYS AND ADVISORS AND ON DEALERS OWN INVESTIGATION REGARDING (I) LENDER, (II) THIS AGREEMENT'S SUBJECT MATTER, AND (III) THE TERMS, CONDITIONS, REPRESENTATIONS, AND OTHER INFORMATION SET FORTH HEREIN (AND IN THE OTHER DOCUMENTS AND AGREEMENTS DELIVERED BY DEALER IN CONNECTION HEREWITH).

12.26  **Entirety of Agreement**.  This Agreement, including any addenda hereto and the Term Sheet signed by Dealer in connection herewith, constitutes the entire agreement between Lender and Dealer with respect to the subject of this Agreement.  Dealer represents, acknowledges, and agrees that, except as expressly set forth herein (and in any addenda hereto and the Term Sheet signed by Dealer in connection herewith), there are no other understandings or agreements between Lender and Dealer, whether written or oral, and Lender has made no inducements, representations, statements, or promises to Dealer with respect to entering into this Agreement.

12.27  **ARBITRATION AND CLASS ACTION WAIVER**.

(a) **ARBITRATION AGREEMENT**. DEALER AGREES TO ARBITRATE ANY DISPUTE OR CLAIM THAT IT MAY HAVE WITH LENDER THAT ARISES OUT OF OR RELATES IN ANY WAY TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; ANY PURCHASE, SALE, OR OTHER AUCTION OR CREDIT TRANSACTION WITH LENDER; DEALER'S USE OF ANY LENDER WEBSITE, ONLINE PORTAL OR ANY LENDER PRODUCT OR SERVICE; OR ANY OTHER AGREEMENT BETWEEN DEALER AND LENDER. ARBITRATION CONDUCTED HEREUNDER SHALL BE FINAL AND BINDING. THIS ARBITRATION PROVISION MEANS THAT DEALER'S CLAIMS AGAINST LENDER WILL BE RESOLVED THROUGH ARBITRATION RATHER THAN LITIGATION IN COURT. DEALER ACKNOWLEDGES THAT LENDER MAY (BUT SHALL NOT BE REQUIRED TO) SUBMIT TO ARBITRATION ANY DISPUTE OR CLAIM THAT LENDER MAY HAVE AGAINST DEALER, WITH ANY SUCH ARBITRATION BEING GOVERNED BY THE PROVISIONS OF THIS SECTION 12.27.

(b) **ABILITY TO OPT-OUT**. DEALER MAY OPT-OUT OF THIS ARBITRATION AGREEMENT AND DOING SO WILL NOT IN ANY WAY PREJUDICE OR AFFECT DEALERS DEALINGS WITH LENDER. TO EXERCISE THIS OPT-OUT RIGHT, DEALER MUST PROVIDE WRITTEN NOTICE OF ITS ELECTION TO OPT-OUT TO LENDER AT ITS ADDRESS SPECIFIED IN SECTION 12.4 NO LATER THAN 30 DAYS AFTER DEALER'S INITIAL ACCEPTANCE OF THESE TERMS AND CONDITIONS AS SET FORTH IN THE FIRST PARAGRAPH HEREOF. THE PROCEDURE SPELLED OUT HEREIN IS THE ONLY WAY TO OPT-OUT OF THIS ARBITRATION AGREEMENT, AND ANY ATTEMPTS TO OPT-OUT AFTER THE DEADLINE SET FORTH HEREIN WILL BE INEFFECTIVE.

(c) **CLASS ACTION WAIVER** ANY ARBITRATION PROCEEDING UNDER THIS SECTION 12.27 WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS OR REPRESENTATIVE PROCEEDINGS OF ANY KIND ARE NOT PERMITTED AND DEALER EXPRESSLY WAIVES ITS ABILITY TO PARTICIPATE IN A CLASS OR REPRESENTATIVE PROCEEDING AGAINST LENDER. TO THE EXTENT THAT DEALER OPTS-OUT OF ARBITRATION FOLLOWING THE PROCEDURE SET FORTH IN SECTION 12.27(b) ABOVE, OR IF THIS ARBITRATION AGREEMENT IS FOUND INAPPLICABLE TO DEALER'S DISPUTE WITH LENDER, THIS CLASS ACTION WAIVER WILL CONTINUE TO APPLY IN LITIGATION. DEALER AGREES THAT THIS CLASS ACTION WAIVER IS AN ESSENTIAL ELEMENT OF THIS AGREEMENT AND THAT IT MAY NOT BE SEVERED. IN THE EVENT THAT THIS CLASS ACTION WAIVER IS DEEMED INVALID OR UNENFORCEABLE, THEN THE ENTIRE AGREEMENT TO ARBITRATE IN THIS SECTION 12.27 WILL BE NULL AND VOID.

(d) **Arbitration Procedures/Arbitrator Authority**. Any dispute or claim subject to arbitration pursuant to this Section 12.27 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation

Service ("JAMS") pursuant to its Streamlined Arbitration Rules and Procedures as in effect at the time of the submission of such dispute or claim (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 12.27 will be resolved by a single arbitrator selected pursuant to the JAMS Streamlined Rules. The arbitrator shall be bound by and shall strictly enforce this Agreement and any other applicable agreement between Dealer and Lender, and may not limit, expand or otherwise modify any of this Agreement or the provisions of any other applicable agreement between Dealer and Lender. The arbitrator may award any relief that a court of law could, applying the limitations of liability contained in this Agreement. The arbitrator may award injunctive relief if permitted by law – but the injunctive relief awarded by the arbitrator may not extend beyond our dealings with each other. The laws of the State of Texas will apply to any claims or disputes between us. Any arbitration will be held in Dallas, Texas, unless otherwise agreed upon by the parties in writing. Each party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator shall award Lender any costs and fees to which Lender may be entitled under the Loan Documents in connection with any indemnification claim, and may also, in his or her discretion, award costs and fees to Lender if it is determined that Dealer submitted or filed any arbitration in bad faith or that its claims against Lender have no reasonable legal basis.

(e) **Application of FAA/Survival**. Dealer agrees that its transactions with Lender evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 12.27 (notwithstanding the application of Texas law to any underlying claims as provided for in clause (d) above). Dealer also agrees that this Section 12.27 survives any termination of these terms and conditions or any other agreement between us.

12.28  **Electronic Signatures**. Dealer acknowledges and agrees that the parties hereto may, from time to time, find it expedient to utilize electronic signature(s), acknowledgement(s), and/or approval(s) for agreements, sales invoices, receipts, titles, and other documents necessary or incidental to the transaction of business with Lender, whether online, in emails, or otherwise. To that end, Dealer agrees that such electronic signatures, acknowledgements, or approvals from Dealer shall be effective and binding upon Dealer, in the same manner as a handwritten signature, where circumstances indicate such intent by the signatory and/or where Lender chooses to rely on such electronic acknowledgments.

**13.    DEFINITIONS**

"**Account Debtor**" shall mean any Person who has Indebtedness to the Dealer.

"**Accounts**", "**Inventory**", "**Fixtures**", "**General Intangibles**", "**Chattel Paper**", "**Documents**", "**Goods**", "**Deposit Accounts**", "**Instruments**", "**Inventory**", "**Investment Property**" and "**Proceeds**" shall mean all of Dealer's such property within the meanings ascribed in the Uniform Commercial Code, as adopted and as in effect from time to time in the state of Texas.

"**ACH**" shall mean all payments made by, or on behalf of, Dealer to Lender via a nationwide electronic funds transfer network processing electronic debit entries from Dealer's bank Accounts pursuant to the ACH Authorization Form executed contemporaneously herewith.

"**ACH Authorization Form**" shall mean the document signed by the Dealer authorizing payment via ACH.

"**Advance**" shall mean any loan or payment in any amount made pursuant to the Agreement and Term Sheet by Lender to Dealer or on Dealer's behalf to any third party.

"**Affiliate**" means, with respect to any Person, any other Person (a) directly or indirectly through one or more intermediaries, controlling, controlled by, or under common control with, such Person, or (b) that directly or indirectly owns more than Ten Percent (10%) of any class of the voting securities or capital stock of or equity interests in such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Demand Promissory Note and Security Agreement, as amended from time to time.

"**Base Rate**" shall mean the greater of the variable rate of interest equal to the most recent prime rate published in the Wall Street Journal or 6.75% per annum.

"**Borrower**" shall mean the Dealer and the Guarantors.

"**Business Day**" shall mean all days on which banks conduct business in.

"**Collateral**" shall mean all of the Dealer's property or rights in which a security interest is granted hereunder.

"**Control**" shall have the meaning ascribed in the Texas Uniform Commercial Code, as in effect from time to time.

"**Credit Limit**" shall mean the maximum amount Dealer may borrow at any one time under this Agreement, as set out in the Term Sheet.

"**Credit Line**" shall mean Dealer's floorplan line of credit pursuant to and under this Agreement.

"**Curtailment Payment**" shall mean the sum Dealer is required to pay Lender to reduce the principal amount due on a unit when the Initial Period and each Extension expires.

"**Dealer**" shall mean the persons or entities disclosed in this Agreement or the Term Sheet.

"**Dealership Location**" shall mean that place where the Collateral and Dealer's books and records are kept, where Dealer's operations are conducted from and/or if Dealer is a legally recognized business entity where Dealer's registered office is located.

"**Dealer's Home Branch**" shall mean the Lender branch location for which the Credit Line is assigned to by Lender for servicing and administration.

"**Default**" means any of the Events of Defaults specified in Section 10 of this Agreement.

"**Default Rate**" shall mean that rate of interest as stated in the Term Sheet or, in the event that no Term Sheet has been signed or the signed Term Sheet fails to list a Default Rate, then 12% per annum.

"**Equipment**" shall mean all furniture, fixtures, machinery, vehicles, aircraft, watercraft, tools, computers and other Goods other than Inventory held for sale, lease, or daily rental by Dealer in the ordinary course of business.

"**Event of Default**" shall have the meaning set forth in Section 10 of this Agreement.

"**Extension**" shall mean that grant by Lender to Dealer of additional time that an Advance for an item of Lender-Financed Inventory becomes due and payable.

"**Extension Fee**" shall mean the fee charged by Lender to Dealer identified as such on the Term Sheet for each individual item of Lender-Financed Inventory.

"**Facilities**" means the Loan and any other credit facility provided by Lender from time to time pursuant to this Agreement.

"**Finance Fee**" shall mean the fee charged by Lender to Dealer identified as such on the Term Sheet for each individual item of Lender-Financed Inventory.

"**Financial Statements**" shall mean, as the context may require, the financial statements of Dealer furnished from time to time pursuant to this Agreement, hereof; in all cases together with any accompanying Agreements or other disclosures to such financial statements, and any other Documents or data furnished to Lender.

"**Float Fee**" shall mean the fee charged by Lender to Dealer identified as such on the Term Sheet for each individual item of Lender-Financed Inventory.

"**Flat Fee**" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"**Floorplan Application**" shall mean the information provided by Dealer, its principals and the Guarantors to Lender including, but not limited to, the application form provided by Lender.

"**Floorplan Fee**" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory. Additionally, in the event no Term Sheet is executed and effective, then the Floorplan Fee shall be equal to One Hundred Fifty Dollars ($150.00).

"**GAAP**" means generally accepted accounting principles in the effect from time to time as promulgated by the Financial Accounting Standards Board and recognized and interpreted by the American Institute of Certified Public Accountants.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government, including, without limiting the generality of the foregoing, any agency, body, commission, court or department thereof whether federal, state, local or foreign.

"**Guarantors**" shall mean Persons who have signed guaranty agreements concerning the Obligations of the Dealer pursuant to this Agreement.

"**Indebtedness**" of a Person means such Person's: (a) obligations for borrowed money; (b) obligations representing the deferred purchase price of Property or services (other than payable arising in the ordinary course of such Person's business payable on terms customary in the trade); (c) obligations, whether or not assumed, secured by any Lien upon or in Property owned by the subject Person or payable out of the Proceeds or production from Property now or hereafter owned or acquired by such Person; (d) obligations which are evidenced by Agreements, acceptances, or other Instruments; (e) capitalized lease obligations; (f) indebtedness or other obligations of any other Person for borrowed money or for the deferred purchase price of property or services, the payment or collection of which the subject Person has guaranteed (except by reason of endorsement for collection in the ordinary course of business) or in respect of which the subject Person is liable, contingently or otherwise, including, without limitation, Obligation by way of agreement to purchase, to provide funds for payment, to supply funds to or otherwise to invest in such other Person, or otherwise to assure a creditor against loss; (g) reimbursement or other obligations in connection with letters of credit; (h) obligations in connection with sale and leaseback transactions; (i) any other transaction which is the functional equivalent of, or takes the place of borrowing, but which would not constitute a Obligation on a balance sheet of such Person prepared in accordance with GAAP.

"**Initial Period**" shall mean shall mean that number of days set forth in the Term Sheet, beginning on the date of an Advance and ending on the Maturity Date, and any Extension thereto, that an item of Lender-Financed Inventory will be financed by Lender to Dealer pursuant to the terms of this Agreement. Additionally, in the event no Term Sheet is executed or the Term Sheet fails to list an Initial Period, then the Period shall be thirty (30) days.

"**Intellectual Property**" shall mean all intellectual property of the Dealer, including, without limitation: (a) all patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice); (b) all trademarks, service marks, trade dress, trade names, and corporate names and all the goodwill and quality control standards associated therewith; (c) all registered and unregistered statutory and common law copyrights; (d) all registrations, applications and renewals for any of the foregoing; (e) all trade secrets, confidential information, ideas, formulae, compositions, knowhow, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, improvements, proposals, technical and computer data, financial, business and marketing plans, and customer and supplier lists and related information; (f) all other proprietary rights (including, without limitation, all computer software and documentation and all license agreements and sublicense agreements to and from third parties relating to any of the foregoing); (g) all copies and tangible embodiments of the foregoing in whatever form or medium; (h) all damages and payments for past, present and future infringements of the foregoing; (i) all royalties and income due with respect to the foregoing; and (j) the right to sue and recover for past, present and future infringements of the foregoing.

"**Interest**" shall mean the rate of interest which accrues on all Obligations owed by Dealer to Lender under or arising out of the Agreement by reference to the Base Rate and/or Default Rate, as applicable.

"**Inventory**" shall mean all Units held by Dealer for wholesale or retail sale, lease, or rent.

"**Lender-Financed Inventory**" shall mean any Unit now or after acquired or retained by Dealer using an Advance under the Agreement and Term Sheet.

"**Lender-Financed Inventory Obligation**" shall mean obligations related to Units acquired by the Dealer using funds advanced by Lender.

"**Lender Published Rate, Fee and Term Schedule**" shall mean any current schedule of interest rates and fees assessed by Lender, including Base Rate, Default Rate, late fees, fees relating to returned checks or ACH payments due to insufficient funds and notice of amendments to terms and conditions published by Lender either at URL www.auctioncredit.com or at its branch offices or locations.

"**Letters of Credit**" shall mean documents evidencing a third party's obligations to honor drafts or other demands for payment for Obligations of the Dealer.

"**Lien**" means any lien (statutory or other), security interest, mortgage, pledge, hypothecation, assignment for the purpose of security, deposit arrangement for the purpose of security, encumbrance or preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement).

"**Loan Fee**" shall mean the fee charged by Lender to Dealer identified as such on the Term Sheet for each individual item of Lender-Financed Inventory.

"**Loans**" shall mean one or more loans from Lender to Dealer up to the initial maximum principal amount disclosed in this Agreement and/or the Term Sheet, or such greater or lesser sum which may be advanced from time to time, governed by this Agreement, including any renewal or Extension thereof.

"**Loan Documents**" shall mean this Agreement, the Agreement, and any UCC Financing Statements and all other Documents executed and delivered by Dealer incidental to or in connection with the Facilities.

"**Material Adverse Effect**" shall mean, with respect to Dealer, any Guarantor, or any of their respective Subsidiaries, a material adverse change in (a) the prospects, properties, business, operations or condition (financial or otherwise) of any such Person, or (b) the ability of any such Person to perform its obligations under this Agreement or any other Loan Documents.

"**Maturity Date**" shall mean the date an Advance for an item of Lender-Financed Inventory becomes due and payable: *provided that*, Lender and Dealer agree that all Advances are due immediately upon demand if Lender elects. In the event the Maturity Date relating to a specific Advance for an item of Lender-Financed Inventory becomes due and payable falls on a federal banking holiday, Saturday or Sunday, the Maturity Date for such specific Advance shall be the next business date subsequent to such federal banking holiday, Saturday or Sunday.

"**MSO**" shall mean the manufacturer's certificate of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

"**Obligations**" shall mean any and all Advances, indebtedness, Lender-Financed Inventory Obligations, financial obligations, administrative fees, Interest, Floorplan Fees, NSF fees, Float Fees, Loan Fees, Extension Fees, Finance Fees, late fees, administrative fees (e.g., in the event Lender waives a default of Dealer) charges, expenses, attorney fees, costs of collection, covenants, and duties owing, arising, due or payable from Dealer to Lender of any kind or nature, present or future, under any instrument, guaranty, or other document whether arising under this Agreement or any other agreement, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired. For purposes of clarity, an Obligation includes, without limitation, any direct financing commitment to an auction or other third party in the amount of (including any financed fees) and from the date of Dealer's acquisition of a Unit(s) regardless of the timing and terms on which Lender settles with that auction or other third party.

"**Odometer Disclosure Statement**" shall mean the sworn statement disclosing whether the mileage reflected on the odometer of the vehicle is accurate.

"**Permitted Encumbrances**" are security interests which have been disclosed to Lender in writing at its address specified in Section 12.4 and which Lender has given its advanced written consent.

"**Person**" means and includes an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated association and a Governmental Authority.

"**Property**" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of the Person, or other assets owned, leased or operated by such Person.

"**Purchase Money Inventory**" shall mean a Unit acquired by Dealer pursuant to an Advance under the Agreement and Term Sheet.

"**Schedule of Accounts**" shall have the meaning ascribed in Section 5.2.

"**Shortage**" shall mean the difference between a payment received by Lender and the amount owing, arising, due, or payable from Dealer to Lender with respect to a specific Advance for a specific item of Lender-Financed Inventory.

"**Special Terms**" shall mean terms disclosed only in the Term Sheet.

"**Stock Rights**" means any securities, dividends or other distributions and any other right or property which the Dealer shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any securities or other ownership interests in a corporation, partnership, joint venture or limited liability company constituting Collateral and any securities, any right to receive securities and any right to receive earnings, in which the Dealer now has or hereafter acquires any right, issued by an issuer of such securities.

"**Subsidiaries**" means, as to any Person: (a) a corporation of which shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person, and (b) any partnership, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a Fifty Percent (50%) equity interest.

"**Term Sheet**" shall mean the addendum to this Agreement, as modified from time to time, which indicates specific terms and fees, including without limitation, terms regarding the Credit Limit, initial Advance, Special Terms, Floorplan Fees, Float Fees, Loan Fees, Extension Fees, Finance Fees Interest, Initial Period, principal reduction, and Curtailment Payment date Extensions and which, as modified from time to time, is incorporated herein by this reference.

"**Title**" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, province or government agency.

"**UCC**" shall mean the Uniform Commercial Code as enacted in the State where the Collateral is located and the version in effect as of the date of this Agreement.

"**Unit**" shall mean any manufactured item, including vehicles for which a certificate of title or a MSO exists which is the subject of an Advance by Lender to Dealer under this Agreement.

"**Unmatured Default**" means any event which with notice, or lapse of time, or both, would constitute a Default.

"**Waivers**" shall mean, collectively, any and all landlord's waivers, warehouseman's waivers, consignee waivers, creditor's waivers, mortgagee waivers and processing facility and similar bailee's waivers, executed and delivered in connection with this Agreement, in form and substance satisfactory to Lender, together with all amendments, supplements, modifications, substitutions and replacements.

*[Signature Page and Acknowledgments Follow On Next Page]*

*THIS BANK HAS A*
*SECURITY INTEREST*
*IN THIS INSTRUMENT*

IN WITNESS WHEREOF, the Dealer, on behalf of themselves individually and in their representative capacities, and Lender have caused this Agreement to be executed by their respective officers duly authorized as of *November 2, 2022*

Accepted:       **"Dealer"**

Legal Name of Dealer:       DFW Boat Specialists, Limited Liability Company
Assumed Business Name of:   AR Motors TX

By:     _Richard Scott Gay_
Name:   Richard Scott Gay
Title:  Member/Manager

By:     _____
Name:   Andrew Lee Kolka
Title:  Signer

Accepted:       **"Lender"**

Auction Credit Enterprises, LLC,
a Texas limited liability company

By:     _____
Name:   Christopher Burton
Title:  Chief Operating Officer

STATE OF    _Texas_    )
                        )  SS:
COUNTY OF   _Dallas_    )

Before me, a Notary Public in and for said County and State, personally appeared Richard Scott Gay, known to me to be the Member/Manager of DFW Boat Specialists, Limited Liability Company, a[n] LLC, and executed the foregoing for and on behalf of said LLC.

Witness my hand and Notarial Seal, this _2nd_ day of _November_, _2022_

Notary Signature:   _____

Notary, Printed:
_Alberto Guerra Jr,_

My Commission Expires:              County of Residence:
_9/26/26_                            _Dallas_

ALBERTO GUERRA JR
Notary ID #131710111
My Commission Expires
September 26, 2026

*[Notary Continued On Next Page]*

STATE OF _Texas_ )
                          ) SS:
COUNTY OF _Dallas_ )

Before me, a Notary Public in and for said County and State, personally appeared Andrew Lee Kolka, known to me to be the Signer of DFW Boat Specialists, Limited Liability Company, a[n] LLC, and executed the foregoing for and on behalf of said LLC.

Witness my hand and Notarial Seal, this _2nd_ day of _November_ , _2022_

Notary Signature:

Notary, Printed:

_Alberto Guerra Jr_

ALBERTO GUERRA JR
Notary ID #131710111
My Commission Expires
September 26, 2026

My Commission Expires:

_9/26/26_

County of Residence:

_Dallas_

---

# Power of Attorney

DFW Boat Specialists, Limited Liability Company ('Dealer'), hereby irrevocably appoints Auction Credit Enterprises, LLC and its successors and assigns ('Lender'), a Texas limited liability company, with its principal place of business at 14951 Dallas Parkway, Suite 200 Dallas, TX 75254, and Lender's employees, officers and agents, as its lawful attorney-in-fact by executing this Power of Attorney in accordance with the Demand Promissory Note and Security Agreement ('Note') contemporaneously entered into by Dealer and Lender, to which all capitalized terms used herein shall have the meanings set forth in the Note, to act with or without the occurrence of an Event of Default and with or without notice to Dealer:

(a)     to act with general authority and delegate such authority with respect to all Dealer's Collateral and all transactions relating thereto;

(b)     to execute security agreements and related documents necessary for Dealer to acquire or sell Collateral;

(c)     to endorse any document, instrument, certificate of title or other evidence of title, state registration documents, or related documents necessary to protect the Collateral in the name of the Dealer;

(d)     receive, open, and dispose of mail addressed to the Dealer;

(e)     to sign and send on behalf of the Dealer any invoice or bill of lading relating to any Account, on drafts against customers, on schedules and assignments of Accounts, on notices of assignment, financing statements and other public records, on verifications of Accounts and on notices to customers;

(f)     to endorse notes, checks, drafts, money orders, documents, or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of Dealer and deposit the same in the account of Lender on account of any Obligation, indebtedness or liability due Lender from Dealer under the Note;

(g)     to demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral or chattel paper related to the Collateral or any insurance claims thereon in such manner as Lender may determine;

(h)     to endorse in the name of and on behalf of Dealer any chattel paper, invoice, bill of sale, document, instrument or bill of lading relating to the Collateral;

(i)     to sign the Dealer's name to all proofs of claim against any account debtor on behalf of Dealer;

(j)     to notify the post office authorities to change the address for delivery of the Dealer's mail to an address designated by Lender and to receive such mail on behalf of Dealer; and

(k)     to do all things necessary to satisfy Dealer's Obligations, indebtedness and liabilities under the Note.

No person to whom this Power of Attorney is presented, as authority for Lender to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from Dealer as to the authority of Lender to take any action described herein, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions contemplated herein, and Dealer irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity which acts in reliance upon or acknowledges the authority granted under this Power of Attorney.

Dealer acknowledges and agrees that Dealer and Lender may, from time to time, find it expedient to utilize electronic and/or indirect signature(s), acknowledgement(s), consent(s), "click-through(s)," or other approval(s) for access to agreements, bills of sale, receipts, titles, and other documents necessary or incidental to the transaction of business with Lender, whether online, in emails, or otherwise, which makes your business with us easier, faster, and more efficient.  To that end, Dealer agrees that any such forms of approval from Dealer shall be effective and binding upon Dealer, in the same manner as a handwritten signature, where circumstances indicate Dealer's intent to be bound and/or where Lender chooses to rely on such electronic acknowledgments.

Power of Attorney – Entity (Upd. 5/15)                25730471.2                Initial: RG  AM                Page 1 of 4

Lender will not be liable for any acts or omissions or for any error of judgment or mistake of fact or law, absent gross negligence, bad faith or willful misconduct. This power, being coupled with an interest, is irrevocable until the Obligations, indebtedness and liabilities have been fully satisfied.

*[Remainder of the page left intentionally blank; signature page follows]*

EXECUTED this *2nd* day of *November*, *2022*

**"Dealer"**

Legal Name of Dealer:   DFW Boat Specialists, Limited Liability Company

By: _____

Name:   Richard Scott Gay

Title:    Member/Manager

By: _____

Name:   Andrew Lee Kolka

Title:    Signer

STATE OF *Texas*        )
                                            )  SS:
COUNTY OF *Dallas*      )

Before me, a Notary Public in and for said County and State, personally appeared Richard Scott Gay, known to me to be the Member/Manager of DFW Boat Specialists, Limited Liability Company, a[n] LLC, and executed the foregoing for and on behalf of said LLC.

Witness my hand and Notarial Seal, this *2nd* day of *November*, *2022*

Notary Signature: _____

Notary, Printed:
*Alberto Guerra Jr.*

ALBERTO GUERRA JR
Notary ID #131710111
My Commission Expires
September 26, 2026

My Commission Expires:

*9/26/26*

County of Residence:

*Dallas*

*[Notary Continued On Next Page]*

STATE OF _Texas_        )
                        ) SS:
COUNTY OF _Dallas_      )

Before me, a Notary Public in and for said County and State, personally appeared Andrew Lee Kolka, known to me to be the Signer of DFW Boat Specialists, Limited Liability Company, a[n] LLC, and executed the foregoing for and on behalf of said LLC.

Witness my hand and Notarial Seal, this _2nd_ day of _November , 2022_

Notary Signature:

_____

Notary, Printed:

_Alberto Guerra Jr._

ALBERTO GUERRA JR
Notary ID #131710111
My Commission Expires
September 26, 2026

My Commission Expires:                    County of Residence:

_9/26/26_                                   _Dallas_



**UCC FINANCING STATEMENT**
**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
XL Funding, LLC 3176897925

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
XL Funding, LLC
10333 N. Meridian St.
Suite 200
Indianapolis, IN 46290
USA

**FILING NUMBER:** 22-0009750631
**FILING DATE:** 02/25/2022    12:17 PM
**DOCUMENT NUMBER:** 1123910120002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |
|---|
| **DFW Boat Specialists, Limited Liability Company** |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **2401 WORTHINGTON DR. STE 106** | **DENTON** | **TX** | **76207** | **USA** |

2. DEBTOR'S NAME - Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |
|---|
| |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| **XL FUNDING, LLC** |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **10333 N. MERIDIAN ST.** | **INDIANAPOLIS** | **IN** | **46290** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All Inventory, whether now existing or acquired and wherever located, specifically including, without limitation, Purchase Money Inventory now owned or acquired, and all additions, accessions, accessories, replacements, and Proceeds, together with any and all books and records; All Equipment, vehicles, vehicle parts, Fixtures, Goods and all other tangible personal property of the Dealer of every kind or nature, whether now owned or acquired, wherever located, specifically including, without limitation, all machinery, trucks, boats, on and off the road vehicles, forklifts, tools, dies, jigs, presses, appliances, implements, improvements, accessories, attachments, parts, components, partitions, systems, carpeting, draperies and apparatus;
All products and proceeds of each of the foregoing, specifically including, without limitation:
any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Dealer from time to time,
any and all payments of any form made or due and payable to the Dealer in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the foregoing by any Governmental Authority or any Person acting under color of Governmental Authority,
to the extent of the value of Collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**UCC FINANCING STATEMENT ADDENDUM**
**FOLLOW INSTRUCTIONS**

9: NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

OR

9a. ORGANIZATION'S NAME
**DFW Boat Specialists, Limited Liability Company**

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

OR

10a. ORGANIZATION'S NAME

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (11a or 11b)

OR

11a. ORGANIZATION'S NAME

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

rights in, or damage to, the Collateral, any Stock Rights, and
any and all other amounts paid or payable under or in connection with any of the
foregoing, whether or not in lieu the foregoing;
All renewals, extensions, replacements, modifications, additions, improvements,
accretions, accessions, betterments, substitutions, replacements, annexations,
tools, accessories, parts and the like now in, attached to or which may be
placed in or added to any Collateral, whether or not of like kind; and
All rights, remedies, claims and demands under or in connection with each of the
foregoing.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

**FILING OFFICE COPY**

**AXLE Funding**

Friday, February 24, 2023
2:10:43 PM

## Receivable Detail Report

**Dealer Name:** AR MOTORS TX / 001-22-01-039 / Dallas    **TEMPORARY HOLD - OTHER**    T1: (855) 575-5858   Attn: Richard Gay / Andrew Kolka  /  828 E McKinney St, Denton, TX - 76209

**Last Lot Audit Date:** 02/21/2023

| Auction Prefix | Deal Nbr | Vehicle 6 VIN | Year - Make - Model - Color | Orig Pri Amount | Curtail /Extns Used | Curtail Amount | Sale Date | Due Date | PTP / CWOT / Sold | o/s from Sale Date | Principal | Reserve | Admin Fee | Interest | NSF Check | Dealer Charges | Total | T P | T C | T R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Title Shipment | - - - | | | | 02/22/2023 | 02/22/2023 | | 2 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $10.00 | $10.00 | | | |
| DC - Tracking # 394943607022 | | | | | | | | | | | | | | | | | | | | |
| METAA | 14905.31 | 622240 | 2012 - Nissan - Armada - WHITE | $5,480.00 | | $1,095.00 | 12/30/2022 | 02/28/2023 | | 56 | $5,480.00 | $75.00 | $90.00 | $108.00 | | | $5,753.00 | Y | Y | N |
| METAA | 14905.34 | 232850 | 2014 - Chevrolet - Cruze - GOLD | $2,185.00 | | $537.00 | 12/30/2022 | 02/28/2023 | | 56 | $2,185.00 | $75.00 | $90.00 | $44.00 | | | $2,394.00 | Y | Y | N |
| METAA | 14905.35 | 337470 | 2013 - Chevrolet - Silverado 1500 - BLUE | $7,500.00 | | $1,438.00 | 12/30/2022 | 02/28/2023 | | 56 | $7,500.00 | $75.00 | $90.00 | $148.00 | | | $7,813.00 | Y | Y | N |
| METAA | 14905.32 | A57563 | 2012 - Ford - Edge - BURGUNDY | $5,580.00 | | $1,112.00 | 12/30/2022 | 02/28/2023 | | 56 | $5,580.00 | $75.00 | $90.00 | $110.00 | | | $5,855.00 | Y | Y | N |
| METAA | 14905.33 | 209271 | 2015 - Jeep - Patriot - BLACK | $4,460.00 | | $947.00 | 12/30/2022 | 02/28/2023 | T: 02/28/2023 | 56 | $4,460.00 | $75.00 | $115.00 | $88.00 | | | $4,738.00 | Y | Y | N |
| METAA | 14905.24 | 177252 | 2011 - Chevrolet - Cruze - GRAY | $2,920.00 | C: 1 | $448.00 | 12/09/2022 | 03/09/2023 | | 77 | $2,482.00 | $0.00 | $60.00 | $15.00 | | | $2,557.00 | Y | Y | N |
| METAA | 14905.25 | 232465 | 2009 - Chevrolet - Avalanche - BLUE | $5,680.00 | C: 1 | $838.00 | 12/09/2022 | 03/09/2023 | T: 02/28/2023 | 77 | $4,828.00 | $0.00 | $85.00 | $28.00 | | | $4,941.00 | Y | Y | Y |
| METAA | 14905.26 | A73544 | 2011 - Ford - Explorer - WHITE | $6,890.00 | C: 1 | $973.00 | 12/09/2022 | 03/09/2023 | | 77 | $5,856.00 | $0.00 | $60.00 | $34.00 | | | $5,950.00 | Y | Y | N |
| MHDFW | 14905.23 | 305185 | 2010 - Chevrolet - Equinox - Black | $4,795.00 | C: 2 | $0.00 | 11/19/2022 | 03/19/2023 | | 97 | $3,463.00 | $0.00 | $60.00 | $4.00 | | | $3,527.00 | Y | Y | N |
| | | | **Total of  9 Vehicles NOT Paid By Dealer** | $45,490.00 | | $7,388.00 | | | | | $41,834.00 | $375.00 | $740.00 | $579.00 | $0.00 | $10.00 | $43,538.00 | | | |

| | |
|---|---|
| **CREDIT LIMIT: $150,000** | **RECEIVABLE BALANCE: $43,538.00** |
| **PAYMENTS IN PROCESS: $819.00** | **PENDING DEALS BALANCE: $0.00** |
| **AVERAGE DAYS OS: 67** | **AVAILABLE LIMIT: $0.00** |