
**Glenview Finance**
Capital Provider for BHPH Dealerships

Exhibit A

BHPH Purchase and
Performance Agreement

This BHPH Purchase and Performance Agreement ("**Purchase and Performance Agreement**"), is made and entered into this on ___23 Sep, 2022___,("**Effective Date**") between the following:

DEALER:

## DFW Boat Specialists, Limited Liability Company

(hereinafter, "**Dealer**") on behalf of itself and its affiliates under common ownership and control ("**Affiliates**"). Dealer and all Affiliates shall hereinafter be referred to collectively as "Dealer";

| | |
|---|---|
| Richard Scott Gay | Angela D. Gay |
| (hereinafter, "**Dealer**", or "**Guarantor**"); | (hereinafter, "**Dealer**", or "**Guarantor**"); |
| Andrew L. Kolka | Nikol L. Kolka |
| (hereinafter, "**Dealer**", or "**Guarantor**"); | (hereinafter, "**Dealer**", or "**Guarantor**"); |

And

PURCHASER:

**Glenview Auto Loan Fund, LLC dba Glenview Finance**

(hereinafter, "**Glenview Finance**" or "**Purchaser**"), an Illinois LLC.

**Introduction**

WHEREAS, Dealer is engaged in the business of selling automobiles ("**Vehicle**", or "**Vehicles**") to customers ("**Customer**", or "**Customers**") and financing Customers directly with Dealer's own capital using retail installment sales contracts, closed-end lending contracts, capital leases, accounts receivables, other securities or other evidences of indebtedness (collectively "Contracts").

WHEREAS, Purchaser is in the business of purchasing Contracts subject to various recourse and other provisions outlined in this Purchase and Performance Agreement.

WHEREAS, Dealer wishes to Sell, and Purchaser wishes to purchase specifically identified Contracts upon the conditions, provisions and terms as stated in this Purchase and Performance Agreement.

WHEREAS, This Purchase and Performance Agreement shall only apply to contracts purchased on or after the Effective Date above unless otherwise specified in writing.

WHEREAS, Purchaser is in the business of buying Contracts subject to various recourse and other provisions outlined in this Purchase and Performance Agreement.

NOW, THEREFORE, in consideration of the promises, the mutual covenant herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Purchase and Sale.
    (a) Sale of Contracts. Subject to the terms and conditions contained in this Purchase and Performance Agreement, while this Purchase and Performance Agreement remains in effect, Contracts may be offered for sale by Dealer to Purchaser at such times that are convenient to Dealer. Dealer is not obligated to sell any one or more Contracts and Purchaser is not obligated to buy any one or more Contracts. Nothing contained in this Purchase and Performance Agreement shall be deemed to require Dealer to sell or Purchaser to buy any Contract now or in the future. Any sale of Contracts may, at Purchaser's discretion, involve due diligence and verification efforts prior to purchase; provided, however, that Purchaser may rely upon representations and warranties made by Dealer in purchasing a Contract. Each purchase of a



Contract by Purchaser shall be deemed to be made in reliance upon representations and warranties made by Dealer regarding such Contract. The Contract's purchase price or advance rate is defined as the percentage of the unpaid principal balance ("Principal Balance") referenced in the Contract and shall be as set forth in Section 2 below.

(b)  <u>Assignment of Security Documents</u>. Upon the sale of each Contract, Dealer shall assign, transfer, convey and deliver to Purchaser (or have said items assigned to Purchaser by any third party), all of Dealer's (or such third party's) right, title, and interest in and to the Contract including, but not limited to, any and all of the following related to the Contract: credit or installment sales applications, account cards, records, forms, papers, security agreements, financing statements, the Evidences of Indebtedness, certificates of title and other forms of security for such Contract (collectively, the "Security Documents") held by Dealer. Dealer shall deliver simultaneously with the sale of each Contract the true complete and correct originals of and any amendments to all Security Documents. A list of all documents required to complete a sale of a Contract to Purchaser are listed in Schedule I: Documents Required to Complete the Sale of a Contract.

(c)  <u>Assignment of Insurance Policies</u>.

  i.  Dealer (or the assigning third party) shall name and/or assign Purchaser as the sole loss payee on all life, disability, credit, collateral, property damage or loss insurance policies, and other insurance policies issued in connection with or relating to the contract with respect to which a Dealer is designated as a beneficiary or co-insured and/or the premiums on such policies were financed under the Contract, together with any and all rights to premiums that may be received upon termination of such policies (collectively the "Insurance Policies").

  ii.  Once Purchaser has been named the sole loss payee and/or first beneficiary under the Insurance Policies, no change to the loss payee and/or beneficiaries of the Insurance Policies shall be made without the written consent of Purchaser.

  iii.  In addition, upon Purchaser's request, Dealer will transfer ownership of any of the Insurance Policies to Purchaser or Purchaser's designee.

  iv.  Upon Purchaser's request, Dealer shall cause Purchaser to be named as an additional insured under the Insurance Policies or any other insurance policy covering the Vehicles subject to a Contract.

  v.  Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

  vi.  Dealer shall deliver simultaneously with the sale of each Contract the true complete and correct originals of and any amendments to all Insurance Policies.

(d)  Payments under Contracts. Dealer, its agents, servants and employees agree and acknowledge that it is **not a collection agent for Purchaser**, and any actions taken by any of them in such a respect are solely on its own behalf unless otherwise specifically authorized in writing by Purchaser. In the event that Dealer shall come into possession of any payments received with respect to or relating to any Contract purchased by Purchaser, Dealer shall turn over, remit and deliver via bank ACH to Purchaser the full amount (**100%**) of all principal, interest, late charges and other specified funds without deduction or offset within one (1) business day of Dealer's receipt of any such payment. In addition, any proceeds from Insurance Policies not applied toward the repair of a Vehicle referenced in the Contract, or other proceeds from Insurance Policies related to any Contract or collateral securing any Contract, shall be turned over, remitted and delivered from Dealer to Purchaser via bank ACH without deduction or offset within one (1) business day of Dealer's receipt of any payment. Purchaser may use the Dealer Statement (as defined in Section 1(f) below) to reflect payments received by Dealer in lieu of Dealer being required to remit such payment to Purchaser, in Purchaser's sole discretion.

(e)  <u>Access to Dealer DMS</u>. Dealer agrees to allow Purchaser, its agents and employees, daily direct data transfers from any Dealer DMS or data management system(s), to Purchaser, which reflect amounts paid to, owed to or collected by Dealer related to the Contracts and that all information requested will be uploaded and available without limitation.



(f) <u>Dealer Statement</u>. Purchaser will provide Dealer a statement ("Dealer Statement") via email, Dealer Portal or other means determined by Purchaser, on at least a weekly basis listing all monies owed to or from Dealer or Purchaser under this Purchase and Performance Agreement or any other agreement(s) between Purchaser and Dealer. Dealer Statement shall include:

    i. A statement of monies due to Dealer from Purchaser for the purchase of Contracts from Dealer,

    ii. A statement of monies due to Dealer from Purchaser for Contract Payments received or collected by Purchaser on Contracts purchased from Dealer by Purchaser,

    iii. A statement listing Contracts required to be repurchased by Dealer from Purchaser, and

    iv. A statement of any other monies rightfully due to or due from Dealer or Purchaser, including, but not limited to, monies from Insurance Policies or any other source due to Dealer or Purchaser under the terms of this Purchase and Performance Agreement.

    v. If Dealer Statement indicates that Dealer owes monies to Purchaser, Dealer authorizes Purchaser to initiate an ACH or electronic withdrawal, or reverse wire from Dealer's bank account(s) for the payment of such amount due on the same business day of the issuance of the Dealer Statement which will typically settle with the Bank the next business day (see Schedule D: Authorization for Automated Debits and Credits of this Purchase and Performance Agreement). In the event Dealer blocks, refuses or otherwise interferes with such ACH or electronic withdrawal or transfer or should such electronic withdrawal or transfer not be honored by Dealer's bank or otherwise fail, in whole or in part, for any reason including, but not limited to, insufficient funds, such event shall be an event of default ("Event of Default") and Purchaser shall be entitled to exercise any remedy made available to Purchaser pursuant to this Purchase and Performance Agreement. If an ACH or electronic withdrawal from Dealer's bank account is denied for insufficient funds, Purchaser may charge Dealer a fee equal to the lesser of Two Hundred Fifty Dollars($250) or the maximum amount allowed by applicable law. The imposition of such a fee shall not act as a waiver or release, by Purchaser, of any of the remedies otherwise available, to it, under the terms of this Purchase and Performance Agreement.

    vi. If Dealer Statement indicates that Purchaser owes monies to Dealer, Purchaser shall pay such amount to Dealer by ACH transfer to Dealer's bank account within five (5) business days after issuance of Dealer Statement, but not including the date Dealer Statement was issued.

    vii. The failure by Purchaser to issue any Dealer Statement or to pay any monies noted on any Dealer Statement to Dealer shall not constitute a breach of this Purchase and Performance Agreement unless Purchaser fails to cure such breach within a period of ten (10) business days after Purchaser receives written notice from Dealer of such breach sent by certified mail, return receipts requested.

    viii. If Dealer believes Dealer Statement contains any misstatement, miscalculation, omission or other error, Dealer has a period of thirty (30) calendar days from the date of such Dealer Statement to provide written notice of such misstatement, miscalculation, omission or other error to Purchaser. To be effective such written notice must include a description of the misstatement, miscalculation, omission or other error that they believe to have occurred and Dealer must provide the calculation that they believe to be correct to enable Purchaser to verify whether any misstatement, miscalculation, omission or other error has occurred. If Dealer does not provide any such written notice to Purchaser within thirty (30) calendar days, Dealer shall conclusively be deemed to agree and acknowledge that such Dealer Statement is correct, final and binding upon Dealer and Dealer will waive all rights to claims for any misstatements, miscalculations, omissions or other errors. Nothing in this section shall preclude Purchaser, of its own accord, from correcting any errors, misstatements or similar matters found by it.

    ix. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(g) <u>Delivery of Vehicle Title</u>. Dealer shall provide Purchaser, within Fourteen (14) calendar days of the date of sale of such Contract to Purchaser, an original Vehicle certificate of title ("Paper Title") or Electronic



Lien Title Transfer ("ELT") document (collectively, "Title", or "Titles"), satisfactory to Purchaser, denoting Purchaser as the first lien holder on the Title of the Vehicle where Purchaser has acquired the Contract secured by such Vehicle. A Vehicle title duly issued to the Customer with the Purchaser shown as the "First Lien holder" is hereinafter referred to as a "Complete Certificate of Title". Dealer may, at its discretion, be shown as an inferior lien holder to Purchaser on any Vehicle title. Purchaser may, in its discretion, require a Complete Certificate of Title prior to funding amounts to Dealer regarding such Vehicle.

(h) <u>GPS Vehicle Tracking Units and Starter Interruption Devices.</u>

    i.    Dealer agrees that a GPS vehicle tracking unit ("GPS Vehicle Tracking Unit") with three (3) years of remaining airtime at the time of funding is required by Purchaser to be installed on the Vehicle referenced in the Contract being purchased by Purchaser prior to said Vehicle being released to the care, custody and/or physical control of the Customer. GPS Vehicle Tracking Units installed by Dealer must be acquired from a vendor approved in writing by Purchaser.

    ii.    If Dealer has installed, utilized or has access to a GPS Vehicle Tracking Unit, starter interruption device or similar unit on a Vehicle, then, prior to releasing said Vehicle to the Customer, Dealer will give the required and proper disclosure of such action to the Customer(s).

    iii.    Dealer is required by Purchaser to disclose to the Customer(s), in writing, that a GPS Vehicle Tracking Unit, starter interruption device or similar unit has been installed on a Vehicle, even if disclosure is not required in the state of contracting.

    iv.    At all times Purchaser shall be provided the most current username and password to access the GPS Vehicle Tracking Unit or similar units' online portal, web or internet access controls.

    v.    Dealer will provide to Purchaser, all documents, forms or other items needed to transfer all rights, ownership and ability to control or monitor such GPS Vehicle Tracking Units, starter interruption devices or similar units to Purchaser upon purchase.

    vi.    Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(i) <u>Ancillary Contracts.</u> If a service contract, maintenance contract, GAP product or other service or product (collectively "Ancillary Contracts") related to a Vehicle is sold by Dealer to a Customer, Dealer will submit full payment to the appropriate vendor providing such Ancillary Contracts on or prior to the tenth (10th) calendar day of the first full calendar month following the date of the sale of Ancillary Contracts to the Customer regardless of the timing of the contractual obligation between Dealer and the provider or vendor of the Ancillary Contracts. If Dealer fails to pay the provider or vendor of the Ancillary Contracts and should Purchaser decide to pay such fees, this amount will be immediately due from Dealer to Purchaser and shall incur a One Hundred Dollars ($100) fee for each Contract that had to be corrected with the vender. Failure to pay the aforementioned One Hundred Dollars ($100) fee, by 5:00 p.m. (Eastern Time) within two (2) business days of the date of notice shall be considered an Event of Default. At no time shall Dealer require the purchase of Ancillary Contracts or any other service or product as a condition of financing the Vehicle purchase.

(j) <u>Delivery of Certain Other Documents.</u> Dealer shall, prior to the sale of a Contract to Purchaser, provide to Purchaser all deal/account documents related to such Contract including, without limitation, any credit applications and credit bureau reports of the Customer which is the subject of the Contract and the purchase order or bill of sale for the Vehicle which is the subject of such Contract. A list of all documents required to complete a sale of a Contract to Purchaser are listed in Schedule I: Documents Required to Complete the Sale of a Contract. This list may change from time to time.

2. <u>Purchase Price of Contract(s).</u>

(a) <u>Purchase Price.</u> The Purchase Price of any Contracts purchased from Dealer, including approved charges for any Insurance Policies, Ancillary Contracts or other services included in a Contract, shall be equal to the "Purchase Price Percentage" referenced in "Schedule F: Directives and Exclusions" multiplied by the principal balance owed by the Customer pursuant to the Contract at the time of sale of such Contract to Purchaser. The Purchase Price Percentage may change from time to time by unilateral notice from the



Purchaser to Dealer prior to any purchase and shall only affect contracts purchased on or after the revision date of Schedule F in such notice. For each Contract, Purchaser shall deduct from the amount due to Dealer a Boarding Fee/Processing Fee equal to the amount referenced in the "Directives and Exclusions" (as defined in Schedule F hereof). Schedule F may change from time to time. This Boarding Fee is to be retained by the Purchaser and shall be fully earned and non-refundable at the time of Purchaser's purchase of the Contract. An additional Boarding Fee may be implemented on a case by case basis to allow for non-conforming contracts at Purchasers discretion, and will be referenced in the weekly statement at time of purchase.

(b) <u>Conveyance</u>. Dealer shall convey to Purchaser each Contract purchased by Purchaser free and clear of all liens, charges, security interests, rights of first refusal, options, charging orders, reservations, restrictions, encumbrances and other defects in Title, or other claims or rights of any third-party (collectively, "Liens"). Moreover, prior to transferring a Contract to Purchaser, Dealer shall pay off and satisfy in full any Liens or other obligations on the Vehicle(s) which are the subject of any Contract transferred to Purchaser. Purchaser may, at its sole discretion, pay off any interest of any third-party in a Contract or any Vehicle which is the subject of any Contract transferred to Purchaser, and, in such event, the Purchase Price paid to Dealer for any such Contract shall be reduced by any such amount paid to a third-party by Purchaser. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(c) <u>Performance Compensation</u>. Performance Compensation shall be equal to  the Performance Fee Percentage referenced in "Schedule F: Directives and Exclusions" multiplied by the actual principal, interest and late fees owed to, paid to and received by Purchaser, in good funds, from Receivables related to Contracts. Other fees for expenses such as forced place or Collateral Protection Insurance DO NOT qualify for any Performance Compensation. The Performance Fee Percentage may change from time to time by unilateral notice from the Purchaser prior to any Contract purchase, and shall only affect contracts purchased on or after Schedule F revision date. Subsequent Schedule F revisions do not affect the Performance Compensation of previously purchased contracts by Purchaser. The Performance Compensation shall be paid on a weekly basis via credit to the Dealer Statement and shall be calculated based on the actual eligible amount paid to and received by Purchaser during the preceding week, subject to the following terms and provisions:

    i.     Neither Dealer nor any of the Dealer's guarantors ("Guarantor" or "Guarantors") (as listed in Section 6: Guaranty below) is in default or breach of any provision of this Purchase and Performance Agreement or of any other agreement between Dealer and Purchaser or Guarantor and Purchaser;

    ii.    Dealer is not experiencing an Event of Default;

    iii.   Neither Dealer nor any Guarantor has an open bankruptcy, filed for bankruptcy protection, or has an involuntary petition in bankruptcy filed against it/him/her subsequent to the execution of this Purchase and Performance Agreement or any other agreements between Dealer and Purchaser or Guarantor and Purchaser, has made an assignment for the benefit of creditors or had a receiver appointed to manage its/hers/his affairs;

    iv.   Section not used

    v.    No Performance Compensation shall be paid to the Dealer regarding payments received related to any "Non-Performing Contract" (as defined in Section 4(a) below) or related to any Contracts repurchased from Purchaser (as defined in Section 4(b) or 4(c) below).

3. <u>Collections</u>.

(a) Dealer, its agents, servants and employees agree and acknowledge that it is not a collection agent for Purchaser, and any actions taken by any of them in such a respect are solely on its own behalf unless otherwise specifically authorized in writing by Purchaser.

(b) Dealer agrees that Purchaser is to service accounts and all payments for monies owed under the Contracts are to be made by the Customer directly to Purchaser.

**GF Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

(c) Dealer shall direct that all payments be made to Purchaser and shall not accept any payments for monies owed pursuant to any Contract.

(d) Dealer shall direct that all insurance proceeds not applied toward repair of the Vehicle referenced in the Contract, or other proceeds from Insurance Policies related to any Contract or collateral securing any Contract, shall be turned over, remitted and delivered to Purchaser via without deduction or offset within one (1) business day of Dealer's receipt of any payment.

(e) Dealer shall immediately notify Purchaser in writing of any dispute with respect to any Contract which may or could affect Purchaser's ability to collect payment(s) on such Contract.

(f) Dealer is hereby authorized to act as Purchaser's agent ONLY for the purposes of adding Purchaser as a loss payee pursuant to such insurance.

(g) Purchaser shall have the right in its sole and absolute discretion to settle, adjust, compromise, extend, renew, discharge, or release any claims under any of the Contracts and to repossess and otherwise enforce claims against the Vehicles which serve as collateral for the Contracts. Dealer shall not, without Purchaser's prior written consent, settle, adjust, compromise, extend, renew, discharge or release any claims under any Contracts.

(h) Dealer shall allow Purchaser, its agents and employees, during normal business hours, full and complete access, in person, remotely and via direct data feed from data vendors to Dealer DMS and/or Dealer's system(s) which reflect amounts paid to, owed to or collected by Dealer related to the Contracts offered to Purchaser by Dealer.

(i) Dealer shall provide to Purchaser the most current username and password to access the GPS Vehicle Tracking Unit or similar units' online portal, web or internet access controls and such units shall be transferred to Purchasers master control account(s).

(j) Dealer grants full and complete access to Purchaser to all programs, reports and identifications for all computer programs utilized by Dealer in the handling, tracking, servicing or review of all Contracts, Vehicles or any other information.

(k) Dealer shall also authorize any third parties requested by Purchaser, in Purchaser's sole discretion, including, without limitation, Dealer's accountants and tax preparers, to share any information such third-party may have regarding Dealer including, without limitation, inventory and floor planning documentation and information, and financial and tax-related information.

(l) Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(m) Purchaser may at its sole discretion place collateral protection insurance ("CPI") on vehicles where the customer has not provided adequate proof of collateral insurance. This will be collected directly by Purchaser and covers the Purchaser's interest in the collateral. Dealer shall not receive or accrue any performance fees from the assessment or collection of CPI premium from Customers. If premiums are unable to be collected by Purchaser, CPI insurance may immediately be dropped rendering the vehicle without insurance. Purchaser is not under any obligation to provide CPI.

4. <u>Repurchases by Dealer of Certain Contract(s)</u>.

(a) <u>Designation of Non-Performing Contract(s)</u>. Dealer agrees that a Contract will be designated as a Non-Performing Contract if any of the following conditions are true:

    i. Any Contract with any payment of Receivables which is fifty (50) or more days contractually past due;

    ii. Any Contract where possession of any collateral for the Contract, including the Vehicle, has been obtained by Purchaser or Dealer;

    iii. Any Contract in which any Customer or guarantor of the Contract, in whole or in part, has filed for bankruptcy protection, had an involuntary petition in bankruptcy filed against it/him/her, or made an assignment for the benefit of creditors;

    iv. Any Contract where the Customer applies for or is granted relief from the obligations, in whole or in part, of the Contract or any other contract related to the purchase of the Vehicle by the Customer; or



BHPH Purchase and
Performance Agreement

     v.    Any Contract otherwise deemed to be a non-performing in accordance with this Purchase and Performance Agreement.

     vi.    Any Contract where the first payment contractually due has not been fully paid within 10 days of the contractual due date.

(b) <u>Repurchase of Non-Performing Contract(s)</u>. Dealer shall purchase any such Non-Performing Contract from Purchaser (as described in Section 4(a) i-v above) on the following terms:

     i.    Dealer shall immediately send written notice to Purchaser of such Contract becoming a Non-Performing Contract via e-mail to **repo@glenviewfinance.com**.

     ii.    Non-Performing Contracts shall be repurchased via the Dealer Statement immediately upon the Contract becoming a Non-Performing Contract.

     iii.    The Repurchase Price to be paid by Dealer for a Non-Performing Contract shall be equal to:

        a.    The Purchase Price Percentage that the contract was originally purchased for by the Purchaser multiplied by the total balance then owed pursuant to the Non-Performing Contract including the principal unpaid balance and any accrued interest, finance charges, and costs as of the date of such payoff, all as determined by Purchaser; plus

        b.    An amount equal to all fees and expenses incurred by Purchaser related to the Non-Performing Contract including, without limitation, returned check fees, repossession fees, storage fees, title fees, any fees associated with the collection of unpaid fees from the Customer, legal fees, and fees related to the recovery and liquidation of any collateral.

     iv.    In the event of any failure of Dealer to purchase any such Non-Performing Contract from Purchaser as set forth in this Section 4 (a)-(b), Purchaser, at its sole discretion, shall be entitled to offset any amounts payable by Dealer pursuant to this Section against any funds owed from Purchaser to Dealer and may make such offset on the Dealer Statement.

     v.    No Performance Compensation or Servicing Compensation shall be paid to Dealer for any Non-Performing Contract.

(c) <u>Voluntary Repurchases of Contract(s)</u>.

     i.    Provided Dealer is in full compliance with all terms of this Purchase and Performance Agreement, Dealer may request to re-purchase from Purchaser any Contract designated by Dealer that satisfies the following criteria: The Customer has made six (6) full Months-Worth of payments to Purchaser (Months-Worth is herein defined as "6 Monthly, 12 Semi-Monthly, 13 Bi-Weekly, or 26 Weekly payments based on payment frequency listed on the retail installment sales contract"), in "good funds". However, if the funds for repurchase are being supplied by a third party; including, but not limited to a Bulk Purchase Agreement; Glenview Finance, in its sole discretion, shall have the right, within ten (10) business days of receipt of proof of the contract and terms offered by such third party, to match the third party offer (less the Repurchase Price) and retain the involved contracts. No Customers are allowed to be contacted by the Dealer or any third party without Purchasers Express Written permission. If all conditions are met by Dealer, and Glenview Finance assents to any sale of the involved contracts to a third party, Dealer may repurchase the contracts for a Repurchase Price equal to the sum of:

        a.    The Purchase Price Percentage that the contract was originally purchased for by the Purchaser multiplied by the total balance then owed pursuant to the Non-Performing Contract including the principal unpaid balance and any accrued interest, finance charges, and costs as of the date of such payoff, all as determined by Purchaser; plus

        b.    An amount equal to all fees and expenses incurred by Purchaser related to the Non-Performing Contract including, without limitation, returned check fees, repossession fees, storage fees, title fees, any fees associated with the collection of unpaid fees from the Customer, legal fees, and fees related to the recovery and liquidation of any collateral; plus

        c.    A fee of **$500.00** per Contract repurchased.



BHPH Purchase and<br>Performance Agreement

  ii. No Performance Compensation shall be paid to Dealer for any Contract repurchased from Purchaser.

  iii. For each Contract repurchased from Purchaser by Dealer pursuant to this Section 4(c) <u>Voluntary Repurchases of Contract(s).</u>, Purchaser may designate, at its sole discretion, one additional Contract which Dealer shall simultaneously repurchase from Purchaser for a Repurchase Price as determined by the formula in Section 4(c)i without regard for how many payments have been made by the Customer. The failure by Dealer to simultaneously purchase the Contract designated by Purchaser shall void Dealer's right to purchase the corresponding Contract designated by Dealer for Repurchase.

  iv. Any repurchase of a Contract where the vehicle has been deemed a total loss by the insurance carrier **shall not** be deemed a Voluntary Repurchase subject to the terms and fees this Section 4(c) and Insurance proceeds are applied as payments against the customer Contract. The application of the insurance proceeds shall be applied to the Customers account and applied first to fees and insurance premiums, then late fees, then accrued interest, and then principal. This application can change in the future at Purchasers discretion without notice to Dealer.

  v. Notwithstanding any provision in this section to the contrary, Purchaser may refuse any Voluntary Repurchase for any reason or no reason at all in Purchaser's sole and absolute discretion.

 (d) <u>Sale of Contract by Purchaser</u>. Purchaser shall have the right to sell or assign any Contract(s) to any third party, in its sole discretion, at any time upon fourteen (14) days prior notice by Purchaser to Dealer. Upon such sale, any right of Dealer to repurchase such Contract pursuant to Section 4(c) above shall immediately terminate. For each Contract sold by Purchaser to a third party, Dealer shall receive a credit related to such Contract equal to the funds received less the price for which the Dealer could have repurchased such Contract pursuant to Section 4(c). When multiple contracts are sold at the same time, any all credits and shortages shall be netted prior to any credit being paid to Dealer. Provided that any contracts sold to a third party required Purchaser to sign any recourse or other contingent liability the credit shall be held until such recourse and/or liability period has expired or been satisfied for all contracts that were sold. Such credit may be paid by Purchaser to Dealer or held by Purchaser to be set-off against other obligations of Dealer to Purchaser. In any event the amount of such credit and whether such credit will be paid to Dealer or held by Purchaser will be reflected in the Dealer Statement. Should the sale price on any Contract or group of Contracts be less than the price for which the Dealer could have repurchased such Contract pursuant to Section 4(c) above, Dealer shall immediately pay the difference. Dealer shall be paid no Performance Compensation or Servicing Compensation regarding any Contract sold by Purchaser. In addition, Dealer shall have no obligation to repurchase or otherwise guaranty the payment or performance of such Contract pursuant to this Purchase and Performance Agreement after the expiration of the recourse period (if any) set in connection with the sale of such Contract to a third party which period shall not exceed ninety (90) calendar days from the date of such sale.

5. <u>Contingent Contracts</u>**.** A Vehicle title duly issued to the Customer with the Purchaser shown as the "First Lien holder" is hereinafter referred to as a **"Complete Certificate of Title"**. If, with respect to any Contract, Dealer is not in possession of, or is unable to deliver the Complete Certificate of Title, that Contract shall hereinafter be referred to as a **"Contingent Contract"**.

 (a) Purchaser may, at its sole discretion, consummate the purchase of the Contingent Contract provided the Dealer delivers to Purchaser a written statement certifying:

  i. An application seeking a Complete Certificate of Title has been properly filed;

  ii. Such application has not been rejected or denied explicitly or by implication; and

  iii. The unavailability of such Complete Certificate of Title is due solely to a fact that the same is being processed by motor vehicle registration authorities.

 (b) Purchaser shall not be required to make payment of the Purchase Price for any such Contingent Contract until such time as Dealer delivers to Purchaser a Complete Certificate of Title or an Electronic



**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

Lien Title Transfer with respect to a Contingent Contract. within 15 calendar days of the purchase of such Contingent Contract and all representations and warranties regarding such Contingent Contract remain true at such date Purchase shall make payment.

(c) Purchaser shall remit the Purchase Price for the purchased Contingent Contract(s) to Dealer as set forth in Sections 1(f) via the Dealer Statement. All payments made on the Contingent Contract subsequent to the purchase of such Contingent Contract by Purchaser which are retained by Dealer shall be delivered to the Purchaser and applied against such Contract's indebtedness, and shall be reflected in the Dealer Statement.

6. <u>Guaranty</u> – This Agreement is Personally Guaranteed by the following:

a. Signed by: Richard Gay — *Richard Gay*

c. Signed by: Angela Gay / Date & Time: Sep 23, 2022 16:06:51 CDT — *Angela Gay*

b. Signed by: Andy Kolka / Date & Time: Sep 23, 2022 15:17:21 CDT — *Andy Kolka*

d. Signed by: Nikol Kolka / Date & Time: Sep 23, 2022 16:14:21 CDT — *Nikol Kolka*

7. <u>Events of Default.</u> In addition to the other events set forth in this Purchase and Performance Agreement as an Event of Default, the occurrence of any one or more of the following events shall constitute an Event of Default:

(a) The failure of Dealer or any Guarantor(s) (as listed in Section 6 Guaranty above) to comply with any provision of this Purchase and Performance Agreement;

(b) The failure of Dealer or any Guarantor(s) to make any payment pursuant to this Purchase and Performance Agreement on the date on which such payment is due;

(c) The inability of Dealer or any Guarantor to pay its debts as they become due;

(d) The filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or against Dealer or any Guarantor;

(e) The application for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors by, or the insolvency of the Dealer or any Guarantor;

(f) The default by any Guarantor(s) under any agreement with Purchaser or its affiliates;

(g) The default by Dealer under any other agreement with Purchaser or its affiliates;

(h) The death, termination of existence, or dissolution of Dealer or any Guarantor(s);

(i) The failure of any representation or warranty of Dealer or Guarantor to remain true, correct, complete and accurate at all times during the term of this Servicing Agreement, which failure is not cured, if curable, within ten (10) days of the receipt of written notice from Purchaser; or

(j) The entry of a judgment for the payment of money against Dealer or any Guarantor which remains unsatisfied, in whole or in part, for a period of more than ten (10) days from the date of entry.

(k) In the event of any Event of Default, Purchaser shall have all remedies available to it at law or in equity, as well as those remedies set forth in this Servicing Agreement.

8. <u>Remedies to an Event of Default.</u> In addition to those remedies available to it at law or in equity or as otherwise set forth in this Purchase and Performance Agreement, Purchaser shall have the following remedies upon an Event of Default:

(a) Purchaser may designate any or all of the Dealer's Contract(s) as Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be purchased by Dealer in accordance with Section 4 above.

(b) Upon Purchaser demand, Dealer shall pay to Purchaser an amount equal to all losses and expenses incurred by Purchaser as a result of the Event of Default including, but not limited to, Purchaser's reasonable attorneys' fees and costs of enforcement of this Purchase and Performance Agreement.

(c) Purchaser at its sole discretion shall no longer be required to accrue or pay any Performance Compensation to Dealer.

(d) Any Event of Default hereunder shall constitute a breach and default of each and every other agreement to which Dealer and Purchaser are parties.



9. <u>Repossession and Storage.</u> If dealer wishes to have a Customer vehicle repossessed, Dealer must get permission from Purchaser prior to repossession. Requests should be made via email to **repo@glenviewfinance.com** or by other forms of written communication including through Dealer Portal. Dealer may charge reasonable and customary storage and repossession fees (for up to five (5) calendar days) to any Customer. Purchaser shall not be liable to Dealer or be otherwise responsible for the payment of any such fees. Further, any liens, security interests or the like which may arise regarding the Vehicle or the Contract because of such fees shall be subordinate to the interests of Purchaser in such Vehicle and Contract, and such fees shall not be paid to Dealer and are hereby waived. However, if Dealer is responsible, to any third parties, for any storage or repair bills, or liens, and such remain unpaid for more than two (2) business days, such shall constitute an Event of Default.

10. <u>Duty to Remit Customer Payments</u>. In the event that Dealer shall come into possession of any payments received with respect to any Contract, Dealer shall turn over, remit and deliver via bank ACH to Purchaser the full amount (100%) of all principal, interest, late charges and other specified funds without deduction or offset within one (1) business day of Dealer's receipt of any such payment. Dealer may NEVER render its own payment to Purchaser, on behalf of any retail customer or consumer under any circumstance. Purchaser may use the Dealer Statement (as defined in Section 1(f)) to reflect payments received by Dealer in lieu of Dealer being required to remit such payment to Purchaser, in Purchaser's sole discretion.

11. <u>Duty to Remit Insurance Policies' Payments</u>. Any proceeds from Insurance Policies not applied toward the repair of a Vehicle referenced in the Contract, or other proceeds from Insurance Policies related to any Contract or collateral securing any Contract, shall be turned over, remitted and delivered to Purchaser via bank ACH without deduction or offset within one (1) business day of Dealer's receipt of any payment. Purchaser may use the Dealer Statement (as defined in Section 1(f)) to reflect payments received by Dealer in lieu of Dealer being required to remit such payment to Purchaser, in Purchaser's sole discretion.

12. <u>Recourse of Dealer</u>. It is understood and agreed that all Contracts purchased by Purchaser pursuant to this Purchase and Performance Agreement are assigned, transferred and conveyed to Purchaser with recourse. In the event that a Customer defaults under or breaches a Contract, Purchaser may designate such Contract as a Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be purchased by Dealer in accordance with <u>Section 4(b)</u>. If Dealer fails to purchase any Non-Performing Contract within ten (10) calendar days after Purchaser provides notification of such failure, Dealer shall pay the full amount due by the Customer pursuant to such Contract to the Purchaser immediately and with no exceptions. All information regarding this agreement and performance/defaults arising out of this agreement may be reported by Purchaser to credit reporting agencies such as but not limited to Experian, Equifax and Transunion. In addition, Purchaser may furnish default information to other entities which include but are not limited to entities that are listed as having UCC filing with the Dealer or any of its principals; and The KO Book maintained by the Auction Insurance Agency; and Cox Auto Group and any of its affiliates; and state dealer associations; and any regulator; and any floorplan finance company; and any other creditor of the dealer. Purchaser is not liable for any consequences of reporting to credit agencies or other interested parties, nor will be responsible for removing any information once reported there.

13. <u>Additional Assurances and Cooperation</u>. Dealer agrees to execute and deliver to Purchaser such instruments of assignment, transfer, financing statements and instruments of further assurances which are reasonable and to take such other actions as Purchaser may require including, without limitation:

    (a) Executing and filing with the registrar of motor vehicles or any other authority responsible for issuing certificates of title and noting security interests thereon, an application or other document requesting the notation or other indication of the security interest on such certificate of title and delivering to Purchaser copies of all such applications or other documents filed and copies of all certificates of title indicating the security interest, and

    (b) Executing and filing such financing, continuation statements, or amendments thereto, or termination statements, and such other instruments or notices as Purchaser may reasonably deem necessary or


**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

desirable, to perfect and preserve the interest in the Contracts assigned to Purchaser and the security interests granted to Purchaser.

   (c)  Any UCC-1 Financing statements Requested that perfect a security interest in business and personal assets of the Dealer and/or any Guarantor

   (d)  Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

14. <u>Indemnification.</u> Dealer shall indemnify, defend, reimburse and hold Purchaser, its officers, directors, employees, agents, servants and representatives harmless from, against and with respect to any damage, tax, liability, claim, loss, deficiency, penalty, obligation, cost, fine, amount paid in settlement and any expense, including reasonable attorneys' fees, disbursements and other costs including costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, and for collection or enforcement of any judgment award or other relief granted, and those arising from the enforcement of this Contract Purchase Agreement occasioned by, arising out of or resulting from, either directly or indirectly:

   (a)  Any claims against and liabilities of Dealer of every kind, nature and description, absolute and contingent, including, without limitation, those arising from or in any way connected with the business and operations of Dealer;

   (b)  Any claims against Dealer by any Customer;

   (c)  Any breach of this Contract Purchase Agreement by Dealer, including, without limitation, any breach of any representation, warranty, or covenant of Dealer contained in this Contract Purchase Agreement;

   (d)  A breach of any of Dealer's servicing and collection obligations;

   (e)  A breach of any of the obligations of the Guarantor of this Contract Purchase Agreement or any guaranty related to this Contract Purchase Agreement;

   (f)  Any Event of Default; or

   (g)  Any actions or omissions of Dealer related to collection of amounts owed from a Customer or realization upon any collateral for any Contract.

15. <u>Payment of Certain Taxes.</u> Dealer shall be solely responsible for all taxes, fees and other charges which shall become due or shall have accrued because of the operation and conduct of Dealer's business or because of the consummation of the transactions contemplated by this Contract Purchase Agreement and the sale, assignment or purchase of any Contract including any deferred sales tax that accelerates upon sale to Purchaser. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

16. <u>Power of Attorney.</u> Dealer shall provide a limited power of attorney appointing Purchaser, its officers, agents, representatives, successors and assigns, as the true and lawful attorney-in-fact and agent of Dealer, pursuant to the terms and conditions of Purchaser's limited power of attorney form found in Schedule A: Limited Power of Attorney. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

17. <u>Remedies Cumulative.</u> All remedies of Purchaser provided in this Purchase and Performance Agreement, or at law or in equity, shall be deemed to be cumulative and not exclusive, and the exercise or enforcement of any one or more remedies shall not preclude the exercise or enforcement of that remedy or any other remedy or remedies. Purchaser's remedies may be exercised singularly, cumulatively, and/or successively.

18. <u>Brokers.</u> Dealer represents and warrants that it has not employed or utilized the services of any broker or other third party in connection with this Purchase and Performance Agreement or transactions contemplated hereby. Dealer agrees to indemnify, reimburse, defend and hold Purchaser harmless from and against the claims of any broker or other third party claiming to have acted on behalf of any party to this Purchase and Performance Agreement.

19. <u>Notices from Purchaser.</u> All notices, elections or demands permitted or required to be made by Purchaser under this Contract Purchase Agreement shall be deemed received by Dealer at the earlier of:

   (a)  The next business day after such notice is sent if sent via overnight courier;

   (b)  The date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax;

   (c)  The date such notice is sent via e-mail; or



**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

    (d)   The date deposited in the United States Postal Service, sent certified or registered mail, return receipt requested to the following address:

20.  <u>Notices from Dealer</u>. Any notices, elections or demands permitted or required to be made under this Contract Purchase Agreement by Dealer shall be made in writing, addressed to **Glenview Auto Loan Fund, LLC, 10130 Perimeter Parkway, Suite 110, Charlotte, NC 28216**, signed by the Dealer giving such notice, election or demand, and shall be deemed received by Purchaser at the earlier of:

    (a)   The next business day after such notice has been received if sent via overnight courier; or

    (b)   The date received by the Purchaser in the United States Postal Service as evidenced by return receipt.

21.  <u>Release</u>. Dealer, each Guarantor, and their officers, directors, employees, agents, servants, heirs, successors, assigns, and representatives, hereby release, dismiss, remise, abandon and/or otherwise forego, Purchaser, and its affiliated companies, partnerships, collective, predecessors, successors, subsidiaries, present and former affiliates, divisions and departments, members, employees, legal representatives, heirs, assigns, agents and servants, and its past, present, and future principals, agents, servants, employees, employers, partners, assignees, heirs, and devisees (collectively, the "**Releasees**") from any and all past and present claims, demands, obligations or causes of action for compensatory or punitive damages, costs, losses, expenses, attorneys' fees, investigative expenses, and compensation, whether based on tort, contract, or other legal or equitable theories of recovery, whether known or unknown, which Dealer and any Guarantors currently have or may have had against any of the Releasees related to any promises, guaranty, contractual obligations or other obligation arising from any and all dealings with any Releasees. In the event that Dealer and Purchaser enter into any additional agreements including, but not limited to, a floorplan or other servicing agreement, the release in this Section 21 , it shall be deemed to have an effective date of the date of its execution and will not supersede or otherwise affect the terms of this Purchase and Performance Agreement unless such is noted expressly, in writing.

22.  <u>Waivers</u>. No waiver of any provision of this Purchase and Performance Agreement, in part of in whole shall be effective unless in writing, addressed and delivered to the other party and duly signed on behalf of the party against whom, the waiver is sought to be enforced. Any waiver so granted shall apply solely to the event occasioning the necessity for a waiver and with respect only to the specific provision applicable the waiver, but shall not apply to any other events or to any reoccurrence of the same or similar events nor to any other provisions hereof. The failure, by Purchaser or Dealer, except by writing as specified above, to exercise any one or more of the provisions of this Purchase and Performance Agreement, on single or multiple occasions and at any time, shall not constitute a modification or waiver of the terms of this Purchase and Performance Agreement, and Purchaser or Dealer may enforce any such provision at any time thereafter.

23.  <u>Severability</u>. In the event that any term or provision of this Purchase and Performance Agreement shall be determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by a court having jurisdiction, that determination shall not impair or otherwise affect the validity, legally or enforceability of the remaining terms and provisions of this Purchase and Performance Agreement.

24.  <u>Binding Agreement</u>. This Purchase and Performance Agreement shall be binding upon Glenview Finance, Dealer and Dealer's Guarantor(s) hereto and their successors and assigns. Purchaser may assign this Purchase and Performance Agreement at any time without prior notice or approval of Dealer. Dealer may not assign its rights, duties and responsibilities under the terms of this Purchase and Performance Agreement without the prior written approval of Purchaser.

25.  <u>Attorney Fees</u>. In the event of the institution of any proceeding based upon a breach of any of the terms or conditions of this Purchase and Performance Agreement and if Purchaser prevails, Purchaser shall be entitled to reimbursement for all reasonable attorneys' fees, court costs and other expenses incurred in connection with such enforcement or proceeding at arbitration or at the trial and/or appellate levels, as well as for all costs, fees and expenses incurred to collect or enforce any award, judgment or other relief granted. In no case shall Dealer be entitled to reimbursement for any attorneys' fees, court costs or any other expenses incurred in connection with such enforcement or proceeding at arbitration or at the trial and/or appellate levels. nor for any costs, fees or expenses incurred to collect or enforce any award, judgment or other relief granted.



BHPH Purchase and
Performance Agreement

26. <u>Contracts Inadvertently Purchased.</u> Should Purchaser discover within thirty (30) calendar days after purchasing a Contract that, at the time of purchase, the Customer was delinquent in payment, Purchaser may designate any such Contract as a Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be repurchased by Dealer in accordance with Section 4 above.

27. <u>Consumer Finance Acts.</u> Dealer agrees to make all records and other documents relating to the Contracts available for inspection by governmental authorities and to maintain all such records and documents for the period required to comply with the laws of the state in which the Contracts were made and are to be performed, and any other local, state, or federal laws which are applicable to any of the Contracts. Records should be retained for the greater of any statutory or regulatory maximum or 10 years.

28. <u>Right to Offset.</u> Dealer agrees that Purchaser, in its sole discretion, may offset any amounts owed by Purchaser to Dealer against any amounts owed by Dealer to Purchaser, regardless of whether the amounts owed by Purchaser to Dealer or by Dealer to Purchaser are owed pursuant to this Purchase and Performance Agreement or any other agreement between Purchaser and Dealer, including, without limitation, any floorplan or servicing agreement or previous Purchase and Performance Agreements.

29. <u>Dealer Contract.</u> This Purchase and Performance Agreement shall constitute the "Dealer Contract" referred to in the "Dealer's Assignment" provision of each Contract purchased pursuant to the terms of this Purchase and Performance Agreement, and this Purchase and Performance Agreement shall govern the terms of any such assigned Contract.

30. <u>Applicable Law.</u> This Purchase and Performance Agreement shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. This Purchase and Performance Agreement shall be deemed to have been made in Charlotte, North Carolina. Venue for any court actions shall be in the Superior Court for the State of North Carolina in Mecklenburg County or the United States District Court for the Western District of North Carolina, Charlotte Division. All parties agree to waive any right to a trial by jury.

31. <u>Insurance.</u> Dealer shall provide Purchaser with any necessary assistance requested by Purchaser, to process and obtain payment for any and all claims, which may arise under the Insurance Policies. Purchaser may submit claims directly to the insurance carriers or require Dealer to file the claim in its name. If Dealer receives any payment on any Insurance Policy, Dealer shall remit to Purchaser such payment within one (1) business days of Dealer's receipt of the same. Dealer shall cause Purchaser to be named as loss payee under the Insurance Policies or any other insurance policy covering the Vehicles subject to a Contract.

32. <u>Reserve Account.</u> Purchaser may elect, in its sole discretion, to purchase Contracts which do not meet all of the Directives and Exclusions (a "**Non-Conforming Contract**"). Dealer agrees, as to any Non-Conforming Contract, to allow Purchaser to withhold funding from the Purchase Price of each Non-Conforming Contract into a reserve account on the books of Purchaser (the "**Non-Conforming Withholding**"). The balance of any Non-Conforming Withholding shall be shown on the funding report provided by Purchaser to Dealer. Purchaser may, at its sole discretion, apply any Non-Conforming Withholding toward the payment of any monies owed to Purchaser by Dealer on any Contracts, including, without limitation, any Contract for which the reserve funds were not initially held. Upon full payment to Purchaser of the amount owed under a Non-Conforming Contract (by the applicable Customer, through a purchase of the Non-conforming Contract by the Dealer or otherwise), Purchaser shall credit any remainder of the Non-Conforming Withholding to Dealer. Such credit may be paid by Purchaser to Dealer or held by Purchaser to be offset against other obligations of Dealer to Purchaser. In any event the amount of such credit and whether such credit will be paid to Dealer or held by Purchaser will be reflected in the Dealer Statement. Notwithstanding the foregoing, nothing in this Purchase and Performance Agreement shall require the Dealer to sell a Non-Conforming Contract to Purchaser.

33. <u>Representations and Warranties.</u> Dealer makes the following representations and warranties to Purchaser intending that Purchaser rely upon each representation and warranty to induce Purchaser to enter into and complete the transactions contemplated by this Purchase and Performance Agreement. Each representation and warranty shall apply to each Contract purchased pursuant to the terms of this Purchase and Performance


**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

Agreement, shall be deemed remade in its entirety each time a Contract is purchased by Purchaser and shall survive the termination of this Purchase and Performance Agreement.

(a) Non-assumption of Dealer's Liabilities. Dealer acknowledges and agrees that Purchaser is not assuming and shall not assume or become liable for any debt, obligation or liability of Dealer by reason of any of the transactions contemplated by this Purchase and Performance Agreement, the assignment or assumption of any Contracts, by operation of law or otherwise. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(b) Organization.
   i. Dealer is duly organized, validly existing and in good standing under the laws in the state in which it is organized and qualified to do business.
   ii. Dealer has the full right, power, and authority to enter into this Purchase and Performance Agreement and each agreement, document, and instrument to be executed and delivered by Dealer pursuant to this Purchase and Performance Agreement. No waiver or consent of any person is required in connection with the execution, delivery and performance by Dealer of this Purchase and Performance Agreement and each agreement, document and instrument to be executed and delivered by the Company pursuant to this Purchase and Performance Agreement.
   iii. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(c) Dealer Authorized to Sell Contracts. Dealer is authorized to sell, assign, transfer and deliver each Contract to Purchaser without restriction of any kind and such sale, assignment and transfer will not violate, contravene, conflict with, or result in a breach or default, or any event that, with the giving of notice or the passage of time or both, would constitute a breach of or default of any of the terms, conditions or provisions of:
   i. Any contract, agreement, loan, extension of credit, floor financing plan, other credit facility or obligation to which Dealer is a Party;
   ii. Any charter, bylaw, statute, rule, regulation, order, ordinance, decree, or judgment applicable to or binding on Dealer; or
   iii. Any instruments to which any of Dealer's assets or properties are subject.
   iv. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(d) Valid Contract.
   i. To Dealer's knowledge, there are no facts, events or occurrences, which may in any case impair the validity, collection or enforcement of any Contract or reduce the amount payable under any Contract.
   ii. Dealer has provided the service and/or has delivered property for which the Customer contracted.
   iii. There are no set offs or counterclaims against any Contract in favor of any other party other than Dealer and no representations, promises, or inducement have been made or other charges imposed other than those described in the Contract.
   iv. The consideration charged to the Customer represents a fair and reasonable price for the services rendered, to be rendered, or property delivered.
   v. The selling price to the Customer includes no charges which are not also imposed upon buyers whose contracts, receivables, and evidences of indebtedness are not sold to Purchaser.
   vi. The Contract shall be conclusive evidence that said endorsement is for value received.
   vii. Each Contract is valid and binding, enforceable in accordance with its terms, and is the sole Contract for the Vehicle which is the subject thereof.
   viii. Each Contract delivered to Purchaser consists of the original documentation, duly executed by the Customer.
   ix. The Customer for each Contract has legal capacity to contract and is not a minor.
   x. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.


**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

(e) Dealer Originates Contracts. Each Contract to be sold under the terms of this Purchase and Performance Agreement was originated by Dealer in the ordinary course of business. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(f) Title of Vehicle Subject to Contract.

    i. Dealer owns and has good and valid Title to each of the Contracts and the corresponding security documents and Insurance Policies, free and clear of all Liens except for Titles held by approved floorplan companies where the Vehicle will be paid off within fourteen (14) calendar days of the date of sale of the Vehicle, at Purchasers discretion, as a condition of sale, Purchase may require that floorplan liens or amounts due are paid directly by Purchaser.

    ii. Each of the Contracts to be sold under the terms of this Purchase and Performance Agreement is secured by Title to, security interests in, or liens on, a motor vehicle under applicable provisions of the motor vehicle code or, other similar laws of the jurisdiction in which the motor vehicle is titled and registered.

    iii. Dealer is transferring to Purchaser good and valid title to each Contract and a valid and perfected first priority security interest in the Vehicle subject to each Contract.

    iv. All financing statements required to be filed under the Uniform Commercial Code or other applicable law of any state to perfect the priority of the security interests in the Vehicle(s) subject to each Contract have been duly filed and have not expired.

    v. All filings with the registrar of motor vehicles or any other appropriate authority and all notations on any certificates of title necessary to perfect a first priority security interest in the Vehicles subject to the Contracts have been duly filed, recorded, registered and made.

    vi. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(g) Compliance. Dealer, its agents, servants, employees, independent contractors and related finance companies shall comply with all federal, state and local rules, regulations, statutes, laws, licensing requirements, ordinances and other governmental requirements or directives ("Laws") applicable to the servicing and collection of Contracts and the debts evidenced by Contracts including, without limitation:

    i. Laws of each state and each jurisdiction in which any Contract was made;

    ii. Laws applicable to the sale of a Vehicle subject to any Contract;

    iii. Laws applicable to the origination, servicing and enforcement of any Contracts including, but not limited to, Laws relating to usury, the Truth-In-Lending Act and Regulation Z, the Equal Credit Opportunity Act and Regulation B, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, Federal Trade Commission rules (such as the "Red Flag Rules"), Consumer Finance Protection Bureau rules and any other consumer protection, equal credit opportunity, fair debt collection or similar Laws whether existing now or in the future; and

    iv. Laws regarding Vehicle repossession, including any Laws regarding notices that are required prior to or after a Contract is repurchased by Dealer from Purchaser.

    v. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(h) Employee Training. Dealer hereby represents and warrants to Purchaser that all its employees, contractors, agents, servants and representatives have been properly trained regarding all applicable Laws and all other requirements related to any activities of any such person pursuant to this Purchase and Performance Agreement or otherwise. Dealer hereby agrees and acknowledges that it is and shall be liable to Purchaser for all violations of any applicable Laws by Dealer or its employees, contractors, agents, servants or representatives. If, in Purchaser's sole discretion, Purchaser determines any such person is inadequately trained, Purchaser may require additional training of any or all such persons prior to any such person engaging in any activities on behalf of Dealer or Purchaser pursuant to this Purchase and Performance Agreement, a floorplan or any other agreement between Purchaser and Dealer. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

Glenview Finance
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

(i) Customer Complaint Management System. Dealer shall maintain a "Customer Complaint Management System" regarding the servicing of the Contracts which complies with all applicable laws including, but not limited to, Consumer Finance Protection Bureau rules and any other consumer protection, equal credit opportunity, fair debt collection or similar Laws whether existing now or in the future. Dealer shall provide written notification to Purchaser regarding the status of all Customer complaints and resolutions to those complaints as Purchaser may request in its sole discretion. In addition, Dealer shall provide written notification to Purchaser regarding any Customer complaints which are not resolved within thirty (30) calendar days of the date such complaint was received by Dealer.

(j) Dealer Audit and Rights of Inspection. During the term of this Purchase and Performance Agreement, the:

vi. Purchaser shall have the right to inspect, both in person or remotely, the books and records of Dealer during normal business hours upon two (2) business days written notice to determine Dealer's full compliance with the terms of this Purchase and Performance Agreement or with any law, Written notice for this purpose shall include email;

vii. Purchase shall have the right, or direct its designated third party, to conduct a physical inspection of all Vehicles on Dealer's premises at any time without prior notice.

viii. Dealer shall provide to Purchaser such other information concerning Dealer or the Contracts as Purchaser shall reasonably request within two (2) business days of a written request for the same. Written request for this purpose shall include email

(k) Dealer Insolvency or Bankruptcy. There has not been:

i. Any event of insolvency of Dealer or Guarantor in the past five (5) calendar years and Dealer is not currently insolvent,

ii. The appointment of a receiver, trustee, custodian, conservator or liquidator or other official for any part of a property or assets of Dealer or Guarantor,

iii. Any assignment for the benefit of creditors of Dealer or Guarantor,

iv. Any filing of a petition in bankruptcy of Dealer or Guarantor, or

v. The commencement of any proceeding under bankruptcy laws, or insolvency laws by or against Dealer, Guarantor or any Customer.

vi. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(l) Fraudulent Transfer. The sale of the Contracts pursuant to the terms of this Purchase and Performance Agreement is not intended to and shall not:

i. Hinder, delay, or defraud any person to which Dealer is now or shall become indebted;

ii. Otherwise cause a fraudulent transfer or preferential transfer under any applicable law; or

iii. Otherwise limit the likelihood that any of Dealer's creditors shall be paid in full.

(m) Bulk Transfer Law. The sale of the Contracts pursuant to the terms of this Purchase and Performance Agreement does not and will not constitute a sale of all or substantially all Dealer's assets or otherwise require compliance with the bulk transfer laws of Dealer's state of organization, any state where Dealer conducts business or the state in which the Vehicles are titled. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(n) Full and Valuable Consideration. Each Contract, together with the corresponding security documents securing the Contract, is made for full and valuable consideration. The security documents pertaining to each Contract constitute valid, binding and enforceable obligations and indebtedness of the respective Customer. Each Customer has possession and title to all the property enumerated or described in the corresponding Contract and has granted to Dealer a first priority security interest in the Vehicle. Each Customer is correctly described by name as the borrower or debtor in the respective security documents and financing statements. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(o) Contract Offsets, Discounts or Forgeries.


**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

     i.     No Contract shall be subject to any offset, discount, counterclaim, dispute or any other defense including, without limitation, usury, unrecorded credits, lack of consideration, fraud, violations of Truth-in-Lending or any other Federal, state, or local laws applicable to such Contract except for the offset right granted to Purchaser under the terms of this Purchase and Performance Agreement.

     ii.    No Contract shall contain any forgery, alteration or undisclosed agreements with persons named therein or any other third parties. The determination of which is in the sole and absolute judgement of the Purchaser.

     iii.   All payments recorded or being credited under each Contract shall have been paid by the Customer and received by Dealer.

     iv.   Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(p)  Contract Transaction Records. The ledger cards and other books, records and documents relating to each Contract fairly, accurately and completely set forth the name and last known address of the respective Vehicle buyer, the terms of the Contract, the amount initially and presently outstanding thereon, the amount of all payments made on such Contract and the dates on which payments were made, and the security, if any, for each Contract. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(q)  Condition of Vehicle.

     i.     Each Vehicle which is the subject of a Contract has been delivered in good and operable condition.

     ii.    Each Vehicle which is the subject of a Contract has all the equipment and accessories as represented to Purchaser on the credit application or other such documents submitted to Purchaser at the time of sale of such Contract to Purchaser.

     iii.   No vehicle has been salvaged, flood damaged or declared a total loss for the purposes of automobile insurance coverage without being expressly noticed to the Purchaser.

     iv.   That the odometer reading supplied to Purchaser is true, accurate and correct.

     v.    Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(r)  Fair Market Value of Ancillary Products and Services. The Purchase Price of Vehicle accessories, service contracts, warranties, GAP protection and similar related services and products is the fair market value of such goods and services, is not overstated or inflated in any way, and (except for GAP protection) represents the price for such goods and services received by Dealer in all other sales of such goods or services. Dealer has not required and will not require the purchase of ancillary products or services, and Dealer has presented all such purchases as an option rather than a condition of the sale and/or financing agreement of the Vehicle. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(s)  Credit Bureau Reports.

     i.     Each credit bureau report submitted by Dealer with the credit application or other documents required to be delivered by Dealer to Purchaser related to a Contract is the true and original credit bureau report as received by Dealer from the credit bureau agency. Each credit bureau report accurately identifies the Customer and accurately sets forth the Customer's credit information. Information contained in the Customer's application for credit is true to the best of Dealer's knowledge.

     ii.    Dealer shall not report credit information to any credit bureaus on any Customers related to any Contract that has been sold to Purchaser other than reporting that the Contract was sold.

     iii.   Dealer shall not represent to Customer that Dealer or Purchaser will report credit information to any credit bureaus after sale of Contract to Purchaser.

     iv.   Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(t)  Denial of Liability. Dealer has no notice or knowledge of denial of liability by the Customer pursuant to or regarding the Contract. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

**Glenview Finance**
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

(u) Contractual Interest Rate. Dealer will not represent and has not represented to any Customer that the contractual interest rate is the best or lowest rate available. Dealer will not represent and has not represented to any Customer that Dealer will arrange the best available financing or interest rate.

(v) GPS Vehicle Tracking Unit Disclosures. Dealer has provided a disclosure to every Customer who has purchased a Vehicle that has a starter interruption device, GPS Vehicle Tracking Unit or similar unit installed in such Vehicle, including in those states of contracting where disclosure of the starter interruption device, GPS Vehicle Tracking Unit or similar unit installed in the Vehicle is not required.

(w) Customer Payment Histories. All information including, but not limited to, Customer payment histories and Customer financial records that is submitted to Purchaser related to a Contract is true, complete and correct to the best of Dealer's knowledge. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(x) Dealer and Guarantor Information. Dealer warrants that all information regarding Dealer and the Guarantors which is supplied to Purchaser including, but not limited to, personal and corporate financial statements, are true, complete and correct. Failure to comply with any, or all, of the terms herein shall constitute an Event of Default.

(y) Authorship of Document. This document was created by the joint efforts of Glenview Auto Loan Fund LLC & Dealer and no inference is to be made that either party drafted, authored or created any portion, or the entirety, of this Agreement.

(z) Headings. The section and other headings contained in this Purchase and Performance Agreement are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Purchase and Performance Agreement.

34. Dealer Contractual Agreement to Comply with the Gramm-Leach-Bliley Act. Dealer represents and warrants to Purchaser (Glenview Auto Loan Fund, LLC) that Dealer presently maintains, and will continue to maintain appropriate information security programs and measures designed to ensure the security and confidentiality of "Consumer Information" (as defined in 16CFR 314.2(b)). Such information security programs and measures shall include appropriate procedures designed to:

(a) Protect the security and confidentiality of such information,

(b) Protect against anticipated threats or hazards to the security or integrity of such information, and

(c) Protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer of Glenview Auto Loan Fund, LLC.

35. LIMITATION ON LIABILITY. IN NO EVENT SHALL PURCHASER BE LIABLE FOR:

(a) THIRD PARTY CLAIMS OR LIABILITIES; OR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE TO DATA, INACCURACY OF DATA, LOSS OF ANTICIPATED REVENUE OR PROFITS, WORK STOPPAGE OR IMPAIRMENT OF OTHER ASSETS OR LOSS OF GOOD WILL, LOSS OF USE, LOSS OF BUSINESS; LOSS OF THE USE OF MONEY; LOSS OF REPUTATION; COST OF SUBSTITUTE EQUIPMENT AND PROPERTY; OR OTHER FINANCIAL LOSS, WHETHER OR NOT FORESEEABLE AND WHETHER OR NOT PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF THIS PURCHASE AND PERFORMANCE AGREEMENT OR ANY LIMITED REMEDY HEREUNDER.

(b) IN NO EVENT SHALL THE TOTAL LIABILITY OF PURCHASER TO DEALER ARISING OUT OF OR IN CONNECTION WITH THIS PURCHASE AND PERFORMANCE AGREEMENT OR ANY OTHER AGREEMENT OR UNDERSTANDING BETWEEN PURCHASER AND DEALER, UNLESS EXPRESSLY SET FORTH IN SUCH OTHER AGREEMENT OR UNDERSTANDING, EXCEED THE TOTAL PERFORMANCE COMPENSATION PAID BY PURCHASER TO DEALER PURSUANT TO THIS PURCHASE AND PERFORMANCE AGREEMENT DURING THE THREE (3) CONSECUTIVE CALENDAR MONTH PERIOD PRIOR TO THE DETERMINATION AND NOTICE TO PURCHASER OF SUCH LIABILITY.

(c) THE LIMITATIONS SET FORTH IN THIS SECTION APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY,



Glenview Finance
Capital Provider for BHPH Dealerships

BHPH Purchase and
Performance Agreement

INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS AND STATUTORY CLAIMS. THE FOREGOING LIMITATIONS SHALL NOT APPLY, HOWEVER, TO LIABILITIES BETWEEN THIRD PARTIES AND PURCHASER WHICH ARISE FROM CONTRACTS DIRECTLY BETWEEN PURCHASER AND SUCH THIRD PARTY.

(d) DEALER ACKNOWLEDGES THAT IT UNDERSTANDS THE LEGAL AND ECONOMIC RAMIFICATIONS OF THE FOREGOING LIMITATIONS AND THAT THE FOREGOING LIMITATIONS ALLOCATE THE VARIOUS RISKS BETWEEN THE PARTIES AND FORM AN ESSENTIAL PART OF THIS PURCHASE AND PERFORMANCE AGREEMENT OF THE PARTIES.

36. <u>DISCLAIMERS.</u> IN ADDITION, AND SUBJECT TO THE LIMITATIONS SET FORTH IN <u>SECTION 35</u>, PURCHASER SHALL NOT BE LIABLE FOR:

(a) ANY FAILED ACH TRANSFER OR OTHER TRANSFER OF FUNDS, EXCEPT TO THE EXTENT PURCHASER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE INITIATION OF ANY SUCH TRANSFER;

(b) ANY TITLE DEFICIENCY FOR ANY VEHICLE;

(c) ANY AGREEMENT OR CONTRACT BETWEEN DEALER AND ANY CUSTOMER OF DEALER (OR ANY OTHER THIRD PARTY) OR THE SUFFICIENCY, VALIDITY, ENFORCEABILITY, OR PROPRIETY THEREOF;

(d) ANY DAMAGE TO ANY COLLATERAL INCURRED IN REPOSSESSION OF THE COLLATERAL OR IN THE EXERCISE OF ANY OTHER REMEDY WHICH PURCHASER MAY HAVE, EXCEPT TO THE EXTENT PURCHASER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE EXERCISE OF SUCH REMEDIES; OR

(e) LOST OR MISPLACED TITLES.

37. <u>Time is of the Essence.</u> Time is of the essence with respect to all time periods in this Purchase and Performance Agreement.

38. <u>No Required Minimums.</u> This Purchase and Performance Agreement sets forth the terms and conditions of potential transactions between Dealer and Purchaser. This Purchase and Performance Agreement does not, however, require the Purchaser or the Dealer to enter into any minimum number of transactions or minimum volume of transactions with the other. Purchaser and Dealer may choose to enter into any number of transactions, including no transactions, with the other.

39. <u>Termination.</u> This Purchase and Performance Agreement may be terminated by Purchaser or Dealer at any time by written notice to the other in accordance with this Purchase and Performance Agreement. Upon termination, Dealer shall be required to purchase all Contracts owned by Purchaser for the amount equal to the amount specified in Section 4 above. All obligations, rights and remedies of Dealer and Purchaser shall survive termination of this Purchase and Performance Agreement.

40. <u>Resolution of Disputes.</u>

(a) Any dispute where the total dollar amount in controversy is less than US$10,000.00 ("Excluded Dispute") shall not be subject to mandatory arbitration as set forth in this Servicing Agreement.

(b) Any dispute, claim or controversy (other than an Excluded Dispute) arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Chicago, Illinois before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Choice of Law shall be North Carolina law. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction, including but not limited to, having a court of competent jurisdiction enter the arbitration award as a duly valid and existing judgment.

41. <u>Dealer and Guarantors Waive Any Right to Trial by Jury.</u> All parties waive any right to trial by jury.

42. Dealer and Guarantor(s) hereby acknowledges and stipulates that it has no claims or causes of action of any kind whatsoever against Purchaser, its affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys, or consultants. Dealer and Guarantor(s) hereby releases Purchaser, its affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys and consultants, from any and



all claims, causes of action, demands and liabilities of any kind whatsoever whether direct or indirect, fixed or contingent, liquidated or non-liquidated, disputed or undisputed, known or unknown, which Dealer and Guarantor(s) now have or may have relating, in any way to any event, circumstance, action or failure to act from the beginning of time to the date of this Purchase and Performance Agreement.

43. <u>Headings</u>. The section and other headings contained in this Purchase and Performance Agreement are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Purchase and Performance Agreement.

44. <u>Counterparts.</u> This Agreement may be executed in several counterparts, each of which may be deemed an original, and all of such counterparts together shall constitute one and the same Agreement. Signatures to this Agreement transmitted by electronic mail in "portable document format" (".pdf"), or by pictorial appearance of a document, or by digital signature platform, such as Secured Signing or DocuSign, will have the same effect as physical delivery of the paper document bearing the original signature.

<u>(Signature Page to Follow)</u>



**BHPH Purchase and Performance Agreement**

IN WITNESS WHEREOF, Purchaser, Dealer and Guarantor(s) have executed this Purchase and Performance Agreement through their duly authorized officers as of the date first set forth above in this Purchase and Performance Agreement. All parties agree to signing legal documents electronically and to be bound to its terms.

## DFW Boat Specialists, Limited Liability Company

**DEALER:**

By: *Richard Gay*
Signed by: Richard Gay
Date & Time: Sep 23, 2022 15:05:49 CDT

Dealer / Guarantor Richard Scott Gay

By: *Angela Gay*
Signed by: Angela Gay
Date & Time: Sep 23, 2022 16:05:50 CDT

Dealer / Guarantor
**Angela D. Gay**

**DEALER:**

By: *Andy Kolka*
Signed by: Andy Kolka
Date & Time: Sep 23, 2022 15:17:23 CDT

Dealer / Guarantor Andrew L. Kolka

By: *Nikol Kolka*
Signed by: Nikol Kolka
Date & Time: Sep 23, 2022 16:14:21 CDT

Dealer / Guarantor
**Nikol L. Kolka**

**PURCHASER:**
**Glenview Auto Loan Fund, LLC**

By: *John Donaldson*
Signed by: John Donaldson
Date & Time: Sep 23, 2022 17:21:40 EDT

Duly Authorized Representative of Purchaser

**Schedule A: Power of Attorney**

A.  KNOW EVERYONE BY THESE PRESENTS, which are intended to constitute a Power of Attorney, THAT, effective
23 Sep, 2022 _____ ("effective date")

**Dealership Legal Name:** DFW Boat Specialists, Limited Liability Company

(hereinafter, "**Dealer**");

located at **the following address:** 828 E. McKinney St.; Denton, TX 76209

hereby makes, constitutes and appoints the officers, agents, representatives, successors and assigns (each, the "Attorney") of **Glenview Auto Loan Fund, LLC** ("Glenview Finance", or "Purchaser"), each Attorney having an address at **10130 Perimeter Parkway, Suite 110, Charlotte, NC 28216**, its attorney-in-fact TO ACT in Dealer's place and stead **in the following manner only**, as if it were present and acting through one of its duly authorized officers, and to the extent that it is permitted by law to act through an agent:

1. To receive, endorse and collect all checks and other negotiable instruments that are made payable to or owed to the Dealer or any predecessor-in-interest of Dealer and that are for payments made by debtors, or received from a Chapter 7 or Chapter 13 bankruptcy trustee, on retail installment sales contracts, closed-end lending contracts, capital leases, accounts receivables, other securities or other evidences of indebtedness (collectively "Contracts") that Glenview Finance has purchased from Dealer as evidenced by the Contract Purchase Agreement for the Purchase and Sale of Contracts entered into as of **Effective Date**, by and between Dealer and Glenview. Such endorsements may be made in any manner deemed appropriate by Glenview Finance.

2. To execute, to the extent necessary by reason of lost, misplaced, damaged or destroyed documentation, lost promissory note affidavits in connection with any applicable Contracts that Glenview Finance has purchased from Dealer as evidenced by the Contract Purchase Agreement.

3. To endorse and/or assign, as applicable, any and all Contracts, and all other Contracts and to execute, acknowledge, or handle proper assignments or other such instruments in writing which may become necessary to file in the public records in order to carry the foregoing powers into effect

4. To act for Dealer, in its name, place and stead and on its behalf, to apply to the motor vehicle titling department of any state for a new certificate of title ("Paper Title") or, if available, an Electronic Lien Title Transfer ("ELT") document (collectively, "Title", or "Titles") for each of the Vehicles referenced in the Contracts purchased by Glenview Finance from this Dealer, where such Title shows Glenview Auto Loan Fund LLC as the first priority lien holder of the Vehicle, in replacement of Auto Dealer or any other person as such first priority lien holder.

5. Prepare and execute on behalf of Dealer any financing statement or other evidence of a security interest contemplated by the Purchase and Performance Agreement, or any modification, refiling, renewal and/or continuation statement, and sign, execute, acknowledge, verify, deliver, file, record and publish any of the foregoing or any other similar document that in the Purchaser's opinion must be filed in order to perfect or continue the perfection of the security interest granted in the Purchase and Performance Agreement or any other agreements between Dealer and Purchaser; and

B.  Dealer hereby ratifies and confirms all acts and things lawfully done by the Attorney or his substitute or substitutes in pursuance of the authority herein granted. The only Contracts to which the authority herein given extends are the Contracts conveyed by Dealer to Glenview Finance under the Contract Purchase Agreement. Dealer hereby agrees and acknowledges that the foregoing powers are coupled with an interest and are

irrevocable by Dealer.  For purposes of clarity, in connection with the foregoing, Purchaser may act in any way which Dealer could if Dealer were present or capable with respect to the foregoing matters to the extent that Dealer is permitted by law to act through an agent.

C.   To induce any third party to act hereunder, Dealer hereby agrees that any third party receiving a duly executed copy or facsimile of this Power of Attorney may act hereunder.

IN WITNESS WHEREOF,  Dealer and Appropriate officer(s) have executed this Power of Attorney through their duly authorized officers as of the date first set forth above.  All parties agree to signing legal documents electronically and to be bound to its terms.

**DEALER:**   DFW Boat Specialists, Limited Liability Company

*Richard Gay*

By: Signed by: Richard Gay
Date & Time: Sep 23, 2022 15:05:40 CDT

Name: Richard Scott Gay
Owner

**SCHEDULE B: UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE**

This Unconditional Guaranty of Payment and Performance (this "Guaranty") is given by the undersigned,
**Guarantor Legal Name:** _____ Richard Scott Gay _____
(hereinafter, "**Dealer**", or **Guarantor**);
**Guarantor Legal Name:** _____ Andrew L. Kolka _____
(hereinafter, "**Dealer**", or **Guarantor**);
**Guarantor Legal Name:** _____ Angela D. Gay _____
(hereinafter, "**Dealer**", or **Guarantor**);
**Guarantor Legal Name:** _____ Nikol L. Kolka _____
(hereinafter, "**Dealer**", or **Guarantor**);
who jointly and severely, for and in consideration of this Purchase and Performance Agreement or any other prior agreement by and between Glenview Auto Loan Fund, LLC, an Illinois Limited Liability Company, (hereinafter referred to as "Glenview Finance" or "Purchaser")
and
**Dealership Legal Name:** DFW Boat Specialists, Limited Liability Company _____
(hereinafter, "**Dealer**").This Guaranty, and any other agreements between Dealer and Glenview Finance including, but not limited to, any documents or instruments now or hereafter evidencing, securing, or otherwise relating to any indebtedness owed to Glenview Finance, as applicable, are referred to herein individually as an "Agreement" and collectively as the "Agreements." Guarantor hereby acknowledges the receipt and sufficiency of such consideration and that the Guarantor is executing this Guaranty for the purpose of seeking to induce Glenview Finance to enter into this Purchase and Performance Agreement with Dealer which will be to the direct interest and advantage of Guarantor. Guarantor further acknowledges that the execution of this Guaranty is a condition of Glenview Finance's agreeing to this Purchase and Performance Agreement and that without this Guaranty Glenview Finance would be unwilling to enter into this Purchase and Performance Agreement with Dealer.
In consideration of the foregoing, Guarantor does hereby unconditionally guarantee to Glenview Finance and its successors, successors in title and assigns (a) the full and prompt payment when due, with such interest, fees and other charges as may accrue thereon, either before or after maturity thereof, of any and all amounts due to Glenview Finance pursuant to this Purchase and Performance Agreement or otherwise due to Glenview Finance by Dealer for any reason whatsoever and (b) the full and prompt payment and performance of any and all other obligations of Dealer to Glenview Finance pursuant to this Purchase and Performance Agreement. References herein to the "Agreements" shall mean and refer to such documents and any renewals, modifications, consolations and extensions thereof including any and all increases in borrowings.

Guarantor further agrees to pay Glenview Finance all costs and expenses (including reasonable attorneys' fees) paid or incurred by Glenview Finance in connection with the enforcement of Dealer's or Guarantor's obligations pursuant to any Agreement or otherwise as a result of Dealer's or Guarantor's breach or default of any Agreement.

No action which Glenview Finance shall take or fail to take in connection with this Purchase and Performance Agreement, or any of them, or any security for the payment of any indebtedness of Dealer to Glenview Finance or for the performance of any obligations or undertakings of Dealer, nor any course of dealing with Dealer or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against Glenview Finance. The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of this Purchase and Performance Agreement and any and all references herein to this Purchase and Performance Agreement shall be deemed to include any such renewals, extensions, amendments, consolations or modifications thereof. This Guaranty unconditionally guarantees the performance of all obligations of Dealer to Glenview Finance made on behalf of Dealer by any officer or agent of Dealer.

Guarantor hereby subordinates any and all indebtedness of Dealer now or hereafter owed to Guarantor to all indebtedness of Dealer to Glenview Finance. Guarantor agrees that Guarantor shall not demand or accept any payment of principal or interest from Dealer, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by any document or instrument securing any of the obligations under this Purchase and Performance Agreement. Notwithstanding the foregoing, however, if Glenview Finance so requests, Guarantor shall enforce any such indebtedness and shall hold in trust and transfer to Glenview Finance any funds or assets received by Guarantor as a result of such enforcement. Any such amounts transferred to Glenview Finance shall be applied to Dealer's indebtedness and other obligations in accordance with this Purchase and Performance Agreement and shall not otherwise reduce or affect in any manner the liability of Guarantor under this Guaranty.

Guarantor hereby waives and agrees not to assert or take advantage of: (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reasons of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of Glenview Finance to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Dealer or any other person or entity; (c) any defense based on the failure of Glenview Finance to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by Glenview Finance which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Dealer for reimbursement, or both; (e) any defense based upon failure of Glenview Finance to commence an action against Dealer; (f) any duty on the part of Glenview Finance to disclose to Guarantor any facts Glenview Finance may now or hereafter know regarding Dealer; (g) acceptance or notice of acceptance of this Guaranty by Glenview Finance; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by Glenview Finance in collection, protection or realization upon any collateral securing the indebtedness evidenced by this Purchase and Performance Agreement; or (l) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

This is a guaranty of payment and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Dealer or any other person, nor against securities or liens available to Glenview Finance, its successors, successors in title, endorsees or assigns. Guarantor waives any right to require that an action be brought against Dealer or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of Glenview Finance in favor of Dealer or any other person.

In the event of a default under this Purchase and Performance Agreement, or any of them, Glenview Finance shall have the right to enforce its rights, powers and remedies thereunder or hereunder or under any other instrument now or hereafter evidencing, securing or otherwise relating to the transactions contemplated by this Purchase and Performance Agreement in any order. All rights, powers and remedies available to Glenview Finance shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Guarantor hereby authorizes and empowers Glenview Finance upon acceleration of the maturity of any indebtedness owed by Dealer to Glenview Finance, at Glenview Finance's sole discretion, and without notice to Guarantor, to exercise any right or remedy which Glenview Finance may have including, but not limited to, judicial foreclosure, exercise of rights or power of sale, acceptance of a deed or assignment in lieu of foreclosures, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases as to any security, whether real, personal or intangible. If the indebtedness guaranteed hereby is partially paid for any reason, this Guaranty shall nevertheless remain in full force and effect,

and Guarantor shall remain liable for the entire balance of the indebtedness guaranteed hereby even though any rights which Guarantor may have against Dealer may be destroyed or diminished by the exercise of any remedy by the Glenview Finance. Until all of the obligations of Dealer to Glenview Finance have been paid and performed in full, Guarantor shall have no right of subrogation to Glenview Finance against Dealer. Guarantor hereby waives any rights to enforce any remedy which Glenview Finance may have against Dealer and any rights to participate in any security held by Glenview Finance. Guarantor hereby authorizes Glenview Finance, without notice to Guarantor, to apply all payments and credits received from Dealer or from Guarantor or realized from any security to the indebtedness, obligations and undertakings which are the subject of this Guaranty in such manner and in such priority as Glenview Finance in its sole judgment shall see fit. The books and records of Glenview Finance showing the accounts between Glenview Finance and Dealer shall be admissible in evidence in any action or proceeding hereon as prima facie proof of the items set forth therein.

This Guaranty is intended as a contract and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. This Guaranty shall be deemed to have been made in North Carolina, Mecklenburg County.

Guarantor hereby (a) submits to personal jurisdiction in the State of North Carolina for the enforcement of this Guaranty with venue in the North Carolina state courts located in Mecklenburg County or, if it has or can acquire jurisdiction, the United States District Court for the Western District of North Carolina, and (b) waives any and all rights to object to jurisdiction within the State of North Carolina for the purposes of litigation to enforce this Guaranty. Guarantor further agrees that service of any complaint in any litigation brought for the purpose, in whole or in part, of enforcing this Guaranty may be perfected by mailing a copy of the summons and complaint to Guarantor by certified mail in the manner hereinafter provided for notice and service and shall be deemed perfected on the date of such mailing. Nothing contained herein, however, shall prevent Glenview Finance from bringing any action or exercising any rights against any security and against Guarantor personally, and against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of this Purchase and Performance Agreement contained herein that the law of the State of North Carolina shall govern the rights and obligations of Guarantor and Glenview Finance hereunder or of the submission herein made by Guarantor to personal jurisdiction within the State of North Carolina. The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative and in addition to all other means of obtaining personal jurisdiction and perfecting service of process now or hereafter provided by the law of the State of North Carolina. All parties waive any right to trial by jury. All Parties agree to the Arbitration provision found in in the Purchase and Performance agreement Section 40 titled "Resolution of Disputes" and agree that this Guarantee shall be subject to the same provisions found therein.

Guarantor represents and warrants to Glenview Finance that any and all financial statements delivered by him or her, either prior to or after the execution of this Guaranty, to Glenview Finance are accurate, true, correct, and complete in all respects as of the date thereof.

As security for the liabilities and obligations of Guarantor hereunder, Guarantor hereby transfers and conveys to Glenview Finance any and all balances, credits, deposits, accounts, items and monies of Guarantor now or hereafter in the possession or control of Glenview Finance, and Glenview Finance is hereby given a lien upon and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of Glenview Finance for any reason, including all dividends and distributions on or other rights in connection therewith. Glenview Finance may, without demand or notice of any kind, at any time, or from time to time, when any amount shall be due and payable hereunder by such Guarantor, appropriate and apply toward the payment of such amount, and in such order of application as Glenview Finance may from time to time elect, any property, balances, credits, deposits, accounts, items or monies of any Guarantor in the possession or control of Glenview Finance for any purpose.

In the event any or all of the obligations and indebtedness evidenced, secured or supported by this Purchase and Performance Agreement are guaranteed by any other person, now or hereafter, Glenview Finance may discharge, release, compromise or otherwise modify any agreements with any such guarantor without affecting the liability of Guarantor in any way. The liability of Guarantor pursuant to this Guaranty shall be joint and several with any other guarantor.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by Glenview Finance or any officer or agent of Glenview Finance, except by a writing signed by a duly authorized officer of Glenview Finance. This Guaranty shall be irrevocable by Guarantor until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Dealer under, by reason of, or pursuant to this Purchase and Performance Agreement have been completely performed.

Any and all notices, elections or demands permitted or required to be made under this Guaranty shall be in writing, signed by the party giving such notice, election or demand, and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

The address of Glenview Finance is: 10130 Perimeter Parkway, Suite 110, Charlotte, NC 28216
The address of Guarantor is: 828 E. McKinney St.; Denton, TX 76209

The provisions of the Guaranty shall be binding upon each Guarantor and his successors, successors in title, heirs, legal representatives and assigns and shall inure to the benefit of Glenview Finance, its successors, successors in title, legal representatives, and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Dealer or Guarantor, if individuals, or by reason of the dissolution of Dealer or Guarantor, if Dealer or Guarantor is an entity.

This Guaranty is assignable by Glenview Finance, and any assignment hereof or any transfer or assignment of any rights or remedies of Glenview Finance pursuant to any Agreement or portions thereof by Glenview Finance shall operate to vest in any such assignee all rights and powers herein conferred upon and granted to Glenview Finance. This Guaranty is not assignable, in whole or in part, by Guarantor

IN WITNESS WHEREOF, Guarantor(s) hereby execute this UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE in their individual capacities as of the date first set forth above in this UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE All parties agree to signing legal documents electronically or digitally and to be bound to its terms.

**Guarantor Name:** Richard Scott Gay

*Richard Gay*

Signed by: Richard Gay
Date & Time: Sep 23, 2022 15:05:40 CDT

Personally Guaranteed

Social Security Number 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

**Guarantor Name:** Angela D. Gay

*Angela Gay*

Signed by: Angela Gay
Date & Time: Sep 23, 2022 16:05:50 CDT

Personally Guaranteed

Social Security Number 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

**Guarantor Name:** Andrew L. Kolka

*Andy Kolka*

Signed by: Andy Kolka
Date & Time: Sep 23, 2022 15:17:23 CDT

Personally Guaranteed

Social Security Number 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

**Guarantor Name:** Nikol L. Kolka

*Nikol Kolka*

Signed by: Nikol Kolka
Date & Time: Sep 23, 2022 16:14:21 CDT

Personally Guaranteed

Social Security Number 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

**SCHEDULE C: REASSIGNMENT OF CONTRACTS**

**Date:** 23 Sep, 2022

**Dealership Name:** DFW Boat Specialists, Limited Liability Company

**Dealership Address:** 828 E. McKinney St.; Denton, TX 76209

**Glenview Auto Loan Fund, LLC**

**10130 Perimeter Parkway, Suite 110**

**Charlotte, NC 28216**

To Whom It May Concern:

RE: Reassignment of Contracts

DFW Boat Specialists, Limited Liability Company

(hereinafter "Dealer")

reassigns its interest in all contracts purchased by Glenview Auto Loan Fund, LLC from this date forward to Glenview Auto Loan Fund, LLC. Glenview Auto Loan Fund, LLC has all rights and liens subject to each contract purchased and therefore have all rights to sign on the behalf of Dealer.

Sincerely yours,

*Richard Gay*

Signed by: Richard Gay
Date & Time: Sep 23, 2022 15:05:40 CDT

Richard Scott Gay

Owner

**Schedule D: AUTHORIZATION FOR AUTOMATED DEBITS AND CREDITS**

By completing and signing this form, Dealer hereby agrees to the following:

1. Dealer authorizes Glenview Finance to initiate credit entries and debit entries and adjustments for any entries in error to the bank account named below as well as any bank indicated on a voided check or bank statement presented by dealer.

2. Dealer's receipt of the Dealer Statement will constitute notice, and the amounts to be credited or debited will be detailed in the Dealer Statement.

3. If an ACH or electronic withdrawal from Dealer's bank account is denied for insufficient funds, Glenview Finance may charge Dealer a fee equal to the lesser of Two Hundred Fifty Dollars ($250) or the maximum amount allowed by applicable law.

4. If Dealer blocks, refuses, or otherwise interferes with any such ACH or electronic withdrawal or transfer or should such electronic withdrawal or transfer not be honored by Dealer's bank or otherwise fail, in whole or in part, for any reason, Glenview Finance shall be entitled to exercise any remedy made available to Purchaser pursuant to the Contract Purchase Agreement.

5. All other terms and provisions provided for in the Purchase and Performance agreement including limitations on liability, shall be fully binding and will remain in full force and effect and shall apply to this Authorization for Automated Debits and Credits.

| Bank and Bank Account Information | |
|---|---|
| Bank Name | Chase Bank |
| Bank Address | PO Box 182051 |
| Bank City, State & Zip Code | Columbus, OH 43218-2051 |
| Bank Contact Person | Bank Contact Person |
| Bank Phone Number | Bank Phone Number |
| ABA Routing Number | 111000614 |
| Checking Account Number | 000000656715312 |
| Please enclose a copy of a voided check | |

| Dealership Name | DPW Boat Specialists, Limited Liability Company | Federal ID | 85-3179081 |
|---|---|---|---|

**Authorized Account Signer**

*Richard Gay*

Signed by: Richard Gay
Date & Time: Sep 23, 2022 15:05:40 CDT
By: _____

Richard Scott Gay
Owner

**Schedule F: Directives and Exclusions**

**Revision Date:** 23 Sep, 2022

Purchase Price Percentage  50%

Performance Fee Percentage  40%

Boarding Fee per Contract  $199

Maximum Amount Financed: 250% of LTV based on NADA Clean Trade + gap + WARRANTY (only adjustments for mileage, no other adds)

Max Term:  48 Months (54 months w/GAP (CarCo) AND/OR Warranty (AUL))

Max Age of Vehicle: No Restriction

Max Mileage: No Restriction

APR Rates: State Max APR%

Minimum Down Payment: $1000 (>$2,500 down payment = NO p.o.i required)

Maximum Payment $500

Maximum PTI: 25%

Minimum NADA Clean Trade Value: $3,000

No Salvage or Branded Titles unless specifically agreed to in advance by Purchaser

No Employee Contracts or Related Party Contracts

All contracts submitted must include full-coverage insurance (maximum $500/$500 deductibles).

**Schedule I: Documents Required to Complete the Sale of a Contract**

Glenview Finance - Funding Checklist (Pay-Share Program)

_____ **Original** Retail Installment Sales Contract reassigned to Glenview Auto Loan Fund, LLC

_____ **Original** State-Specific Limited Power of Attorney Form

_____ **Original** Contracts for any Ancillary products (Ancillary products include: GAP, Extended Warranty)

_____ Bill of Sale, Buyer's Order or Purchase Agreement

_____ Completed and Signed Customer Credit Application

_____ Copy of Valid Driver's License/ ID for borrower and all co-borrowers

_____ Two (2) Customer Personal References

_____ Copy of State-Specific Title Application

_____ Proof of Income (If $2,500> down payment = no p.o.i required)

_____ Odometer Disclosure Statement- (if already disclosed on another form = OK)

_____ CPI #3 – "IMPORTANT INFORMATION ABOUT PHYSICAL DAMAGE INSURANCE" (Glenview Finance Form)

_____ GPS Manufacturer and Serial Number: _____

_____ GPS/Starter interrupt Disclosure Form (Glenview Finance Form Preferred)

_____ Arbitration Agreement Form (Glenview Finance Form Preferred)

_____ Consent to Contact Form (Glenview Finance Form Preferred)

_____ **Proof of Hard Costs and Internal Labor Costs (since we will not be using NADA values) **

_____ If no CPI Insurance then proof of Comp/Collision policy w/$500 deductibles - Glenview Auto Loan Fund
LLC listed as First Loss Payee/Lien Holder


** Use this link to submit deals: Glenviewfinance.com/send


TITLING A VEHICLE:

1ST LIEN HOLDER: Glenview Auto Loan Fund, LLC 2nd LIEN HOLDER: Dealer to be listed


10130 Perimeter Parkway, Suite 110 as 2nd lien holder

Charlotte, NC 28216


Glenview Auto Loan Fund, LLC Lienholder ID numbers:

Florida: 239631215,

Georgia: 001112206770,

Texas: 47127958900,

South Carolina: 34466937,

North Carolina: 43224866

# Video Confirmation

Invitee: Richard Gay, Video URL: https://ds4u.cc/VafQJQzVRr, Password: 810022

Invitee: Andy Kolka, Video URL: https://ds4u.cc/BayQmQBjkZ, Password: 375208

Invitee: Angela Gay, Video URL: https://ds4u.cc/oaEQuQkjSb, Password: 042820

Invitee: Nikol Kolka, Video URL: https://ds4u.cc/iawQDQLjtY, Password: 613869

# IDCheck Summary Page

ID Verification for **Richard Gay**, Email address - **richard@armotorstx.com**, click <u>here</u> to view the result.

ID Verification for **Andy Kolka**, Email address - **andy@armotorstx.com**, click <u>here</u> to view the result.

ID Verification for **Angela Gay**, Email address - **angie_gay@hotmail.com**, click <u>here</u> to view the result.

ID Verification for **Nikol Kolka**, Email address - **nikol@dfwboatspecialist.com**, click <u>here</u> to view the result.



## Glenview Finance
### Capital Provider for BHPH Dealerships

### *Schedule F Update*
**PAY-SHARE PROGRAM – DIRECTIVES**

Dealer Name:  **DFW Boat Specialist LLC dba AR Motors**          Date: **3/20/23**

Advance:  **50**% of Amount Financed or Principal Balance

Dealer Receives:  **40**% of each payment

Boarding Fee: **$349** / Contract

Max Amount Financed: 200% of LTV based on **NADA CLEAN TRADE**

Max Term:  48 Months (54 Months with Glenview GAP and/or Warranty)

Max Age of Vehicle:  None

Max Mileage:  150,000

APR Rates:  State Max APR%

Max Payment:  $500 per Month (Negotiable with max 20%PTI)

Minimum Down Payment: $1,000.  ** All deferred down payments must be collected prior to Funding

SS or ITIN is Required

Valid Drivers' License

Minimum NADA CLEAN TRADE Value: $5,000

Addendum to Credit Application (Glenview Form) Required on all deals

GPS Required for Funding.  Approved GPS Manufactures are:  Sarekon, Passtime, Advantage, or Goldstar.

No Employee Contracts or Related Party Contracts

All contracts submitted must include full-coverage insurance (maximum $500/$500 deductibles) or can take advantage of CPI.

No Salvage / Branded Titles Accepted